UNITED STATES, Appellee

v

TUUGASALA AAU, Dental Technician Third Class, U. S. Navy, Appellant

12 USCMA 332, 30 CMR 332

333

*Commander John S. Lane,* USNR, argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Leo F. O'Brien,* USN.

*Lieutenant Commander Raymond O. Kellam,* USN, argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel J. E. Stauffer,* USMC.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused is a Samoan who has served about five years in the United States Navy. He was brought before a general court-martial convened in Pearl Harbor, Hawaii, on charges of premeditated murder, attempted murder, and assault with intent to inflict grievous bodily harm, in violation of Articles 118, 80, and 128, respectively, of the Uniform Code of Military Justice, 10 USC §§ 918, 880, 928.[1] He was represented by appointed military counsel and Talking Chief Manaea of Laulii, Island of Tutuila, American Samoa, who by Samoan custom "acts as an attorney or counsel before . . . [Samoan] local courts.[2]

Before pleading, the accused moved to dismiss the murder charge on the ground of double jeopardy. The motion was based on the performance before trial of the ancient Samoan custom of Ifoga which means "saving." According to the custom, if a member of one family offends a member of another family, the family of the offender proceeds to the headquarters of the family of the offended person and asks forgiveness for the offense. After appropriate confession of guilt and ceremonial contrition by the offending family,

the family offended against can forgive the offense and save the wrongdoer and his family from punishment. The accused's family, which included High Chief Asoau and Talking Chief Manaea, completed the rites of Ifoga with the chiefs and family of the homicide victim. The defense contended the procedure was the equivalent of a Federal prosecution in that Samoan custom is recognized in the courts of Samoa. Since these courts derive their authority from the United States, the defense argument continued, the accused was being twice put in jeopardy by the present prosecution. The motion to dismiss was denied. The ruling was correct.

It appears that Samoa has a hierarchical system of courts, extending from the Village Court to the High Court of Samoa, and the Attorney General of Samoa prosecutes felonies. Had the offense been committed in Samoa, and had the accused been tried in the appropriate court in Samoa, there might be some question of double jeopardy. United States v La Plant, 156 F Supp 660 (D Mont) (1957). However, the offenses were committed in Hawaii, not Samoa, and nothing presented by the defense indicates they are even cogniz-

[1] The court-martial convicted the accused of unpremeditated murder and other charges and imposed a sentence which included a dishonorable discharge and confinement at hard labor for forty years. The convening authority approved the findings but modified the sentence. On further review, the board of review modified the attempted murder findings and reduced the confinement to fifteen years.

[2] Cf. United States v Kraskouskas, 9 USCMA 607, 26 CMR 387; United States v Sears, 6 USCMA 661, 20 CMR 377.

able in a Samoan court.[3] While custom is undoubtedly important[4] in Samoan life, there is no showing, under the Code of Laws of the Government of American Samoa, that the custom of Ifoga is a recognized defense to the offenses charged. See United States v Whaley, 37 Fed 145 (CC SD Cal) (1888). To the contrary, the stipulated testimony by Chiefs Tavai and Pule, the heads of the victims' family, indicate that while the process of public humiliation and apology included in Ifoga may result in "forgiveness" by both the central government and the aggrieved family, absolution by one authority is not binding upon the other. Rather, it appears that the chief of the "forgiving" family can only request "recognition and acceptance" by the court of the family's forgiveness. Indicative of the merely persuasive effect of the action by one authority in regard to action by the other is defense counsel's concession that a trial by court-martial would not bar Ifoga. Under the provisions of the Code of Laws of the Government of American Samoa, the High Court of Samoa is given "exclusive jurisdiction" over charges of "murder, manslaughter, and assault with intent to kill." Code of Laws of the Government of American Samoa, Section 173. It quite clearly appears that legal recognition of custom in the regulation of conduct affecting the public extends only to meetings between hereditary and talking chiefs to "discuss affairs of the village, county, or district according to their own Samoan custom." Code, supra, Section 2. Decisions reached by the chiefs, which are intended to have the force of law, can relate to "matters of a strictly local nature," and then only to the extent "otherwise permitted in this Code." It is plain that a homicide or assault committed in Hawaii is not a matter of "a strictly local nature." Finally, the specific prohibitions in the Code of Laws against certain Samoan customs which sanction destruction of property and the imposition of fines indicate that custom cannot absolve a wrongdoer from prosecution for a violation of the criminal law. See Code of Laws, supra, §§ 805, 808, 818, 827, 840, 869.

Turning to the trial issues, two claims of error are alleged regarding the admission into evidence of certain actions by the accused on the morning of the murder. Briefly, the background is as follows. In 1959, the accused married Toga, the young niece of Atimani Alo, a Samoan living in Hawaii. The marriage took place in Hawaii, and the couple took up residence with Alo and his family in an apartment in the Halawa Housing Area in Honolulu. Not long thereafter, differences arose between the accused and his wife, and the accused was compelled to leave the household. However, Toga remained. During May, the differences were composed sufficiently to enable the accused to return to the apartment, but he was still denied the marital bed, and was obliged to sleep in the parlor. This state of affairs continued until the morning of May 26, 1959. About two hours after Alo left for work, the Honolulu police went to the apartment in response to a call by a neighbor. They discovered Mrs. Alo in the bedroom with her head bashed in. Florence, her seven-year-old daughter, was lying unconscious on a mattress; she was covered with blood, and later examination disclosed she had a skull fracture. Toga was next door in a neighbor's house. She had a fractured skull and multiple bruises about the head and face, which had been inflicted by the accused with a large metal file. At the time of the assault, the accused had told her he "was going to kill" her. The accused himself was on the floor of the parlor in the Alo apartment; a kitchen paring knife was stuck in his stomach and he had a large gash across his neck. Officer Leehman of the Hawaiian Police applied first aid to the accused in the form of a compress over the throat wound. After discovering

[3] The Code of Laws of the Government of American Samoa, 1949, Section 41, appears to exclude the exercise of jurisdiction.

[4] Among other things, custom provides the basis for selection of certain titles which permit the holders to sit in the House of Alii (Senate Chamber) of the advisory legislature (the Fono).

he could "communicate" with the accused, he asked him a series of questions because he was sure the accused was going to die. The questions and the accused's responses are as follows:

". . . The first question I asked Mr. Aau was if he did this to them, indicating with my finger in the direction of the body of Mrs. Alo, the little Aau girl, and his wife, and the location of where their bodies were, and he nodded affirmatively. The second question I asked him was if his wife had been fooling around, and he indicated no negatively, shaking his head. The third question I asked him, did he do it because of money? He nodded yes, up and down, up and down. The final question I asked him if he knew he was going to die, and he nodded yes, up and down."

Other evidence shows the accused was examined on May 26 by Captain G. L. Johnson, the surgical resident at Tripler Army Hospital, in the room used for the "admission of severly [sic] injured patients." Johnson described the nature of the accused's wounds and the procedures used to remove the knife and treat the throat wound. The doctor had treated others for similar wounds; in his experience, none of the throat wounds and only one of the abdominal wounds had been fatal. In general, the type of throat wound the accused had "is very seldom fatal," because the mechanism in effecting such a wound "retracts all the vital portions out of the way of the wound." Captain J. F. McMullin, a Navy psychiatrist, testified that he examined the accused "early after admission to the hospital" to get "some idea of his emotional state." He tested the accused's memory, recall, ability to concentrate, and ability to calculate. He concluded the accused was not suffering from any mental illness or defect, either before or on the date of the assaults.

Appellate defense counsel contend the accused's physical and mental condition were so depleted by his wounds that the responses he made to the questions by Officer Leehman were not free and voluntary acts. Unquestionably, the accused's wounds were serious. Serious physical injury is an important circumstance in determining whether a pretrial statement is voluntary, but it is not itself determinative of the issue. Notwithstanding the injury, the accused could still possess sufficient control over his mental faculties to be able to decide freely whether to speak or to remain silent when asked about his participation in the offenses. The evidence indicates the accused was oriented to his surroundings, and was able to think clearly, despite his wounds. In this situation, the question whether his responses were voluntary was a factual one for the court-martial. In other words, we cannot say they were involuntary as a matter of law. Cf. United States v McClung, 11 USCMA 754, 29 CMR 570; United States v Walker, 9 USCMA 187, 25 CMR 449.[5]

Moving from voluntariness to warning, appellate defense counsel maintain that the accused's responses were inadmissible because the Hawaiian police did not advise him of his rights under Article 31 of the Uniform Code. The argument is based upon an agreement which existed at that time between the civilian police and the armed services. Under the terms of the agreement, a person in the military service, suspected or accused of a serious offense, was usually turned over to the armed forces for prosecution. At trial, defense counsel established that Leehman was aware of the agreement, and was "pretty well aware" that the accused was a sailor. Defense counsel maintained that the unique relationship between the civilian police and armed forces police constituted Leehman an instrument of the military. See United States v Holder, 10 USCMA 448, 28 CMR 14. The issue

---

[5] It is appropriate to note that the law officer advised the court-martial at the time of the admission of the evidence, and again in his final instructions, that it should consider the evidence only if it first determined beyond a reasonable doubt that the accused's responses were voluntary; he also advised the court-martial that if it entertained a reasonable doubt, it "must reject" and disregard the evidence.

was considered by the board of review below. It concluded the agreement itself did not transform the civilian police into agents or instruments of the military in the investigation of offenses committed in the civilian community by military personnel. We agree with that conclusion. Whether the general cooperation between the two police groups was of such a nature as to represent a calculated and deliberate evasion of the requirements of Article 31 was, under the evidence adduced at the trial, a question of fact for the court-martial. It was submitted to the court for its determination by instructions, which we shall consider later in this opinion.

Two other pretrial statements were made by the accused. One was made the day after the homicide. Civilian police, accompanied by a Hawaiian Armed Services Police representative, visited the accused at the hospital. Without advising the accused of his rights under Article 31, the civilian officer questioned him about the homicide and assaults. Only a few questions were asked because the accused appeared to experience difficulty in talking. The next statement was a full oral confession. It was obtained on June 1 by an agent of the armed service police and several civilian police officers. On this occasion, the accused was fully advised of his rights under Article 31. He said he knew he did not have to say anything but he "was willing to say everything."

The prosecution made no attempt to introduce the May 27 statement. It did, however, seek to introduce the June 1 statement. An out-of-court hearing was held on its admissibility. In the hearing, defense counsel inquired into circumstances surrounding the May 27 statement. He objected to the June 1 statement on the ground it was "tainted" by the circumstances of the May 27 statement. In view of the defense objection, the law officer submitted the May 27 statement and its surrounding circumstances to the court-martial, with specific instructions that the matter not be considered on the

merits, but only for the limited purpose of determining the voluntariness of the June 1 statement. No objection was interposed by defense counsel. Also, he argued the question of the voluntariness of the June 1 confession before the court-martial. In view of the nature of the objection, the procedure adopted by the law officer was correct. United States v Sapp, 1 USCMA 100, 2 CMR 6; see also United States v Dicario, 8 USCMA 353, 24 CMR 163.

Complaint is also made about another part of the procedure followed in regard to the pretrial statements. When court reconvened after the out-of-court hearings on the circumstances surrounding the making of the several statements, the law officer read the testimony adduced by both parties. It is now contended that this testimony constitutes inadmissible hearsay. It is apparent, however, that the testimony is not hearsay in the ordinary sense. Every witness testified under oath; the testimony was given in the presence of the accused and his counsel; and every witness was subjected to cross-examination. There is, therefore, a good deal to be said for the argument that the evidence can be considered on the same basis as former testimony, rather than as the ordinary out-of-court statement by a witness. In any event, the record of trial compellingly shows that the defense willingly participated in the procedure and used the testimony to create issues for its own benefit. Consequently, it cannot now be heard to say that the procedure was prejudicial. See United States v Niolu, 4 USCMA 18, 15 CMR 18.

Finally, the accused contends that the law officer erred in his instructions in regard to the voluntariness of the May 26 and June 1 statements. In material part, the law officer advised the court-martial as follows:

". . . You will also consider that it is not voluntary if you find that, after charges had been preferred against the accused or while he was suspected of the offenses, it was obtained from him through the interrogation or at the request of a per-

son not subject to the Uniform Code of Military Justice during an official military investigation or while acting as an instrument of the military, who did not first inform the accused of the nature of the accusation and advise him that he did not have to make any statement regarding the offense of which he was accused or suspected, and that any statement made by him may be used as evidence against him in a trial by court-martial. The term 'while acting as an instrument of the military' means, insofar as it is relevant in this case, that the person not subject to the Uniform Code of Military Justice was, at the time the statement was taken, acting in behalf of the armed forces as an agent. Again insofar as it is pertinent to the question now before the court, a person is the agent of the armed forces when members thereof have the right to, or do in fact, exercise control over the manner in which the person not subject to the Uniform Code of Military Justice obtained the out of court statement from the accused. Furthermore, you are advised in this connection that this out of court statement of the accused is also not voluntary if it was obtained from him through the interrogation or at the request of a person not subject to the Uniform Code of Military Justice, who did not first inform the accused of the nature of the accusation and advise him that he did not have to make any statement regarding the offense of which he was accused or suspected, and that any statement made by him might be used as evidence against him in a trial by court-martial, if you find that there was subterfuge or any attempt to avoid the requirement that the accused be advised as I have just instructed you. The burden of proof on this issue as in all the other issues is upon the prosecution to establish beyond a reasonable doubt."

Two deficiencies purportedly exist in the quoted instruction. First, it said that the law officer's explanation of the phrase "while acting as an instrument of the military" im-

**338**

properly limits its meaning and application to persons acting as formal agents of the military. To constitute a civilian policeman the "instrument" of the military, there must be some direction or control over him or some authorization or request by the military that he act for it. See United States v Holder, supra. In other words, there need not be the kind of underlying agreement that is required for creation of the legal relation of principal and agent. In common usage, however, one who acts as an "instrument" for another in accomplishing a particular purpose can properly be described as an agent. Thus, among other definitions, the dictionary defines an agent as "an instrument." Webster's New International Dictionary, 2d ed, page 48. We think the instructions made it sufficiently clear that the military's informal direction to, or request of, the civilian police that it act for the military in obtaining a statement from a military accused would be enough to require the Article 31 advice. If defense counsel desired further amplification, he should have requested it. We find no merit in this part of the challenge to the instruction.

In the second allegation of deficiency, the accused maintains the instruction is improper because it permitted the court-martial to consider the June 1 confession, even if it found that the accused was not advised of his rights under Article 31. The short answer to this assignment is that the accused was, in fact, advised of his rights before he was interrogated on that day. He admitted as much in his own testimony although he maintained variously that he believed the police officers had come to "save" him, that is, absolve him by an Ifoga and that he did not understand his rights. The latter contentions were submitted to the court-martial under appropriate instructions.

The decision of the board of review is affirmed.

Judge FERGUSON concurs.

Judge LATIMER concurs in the result.