**UNITED STATES, Appellee,**

v.

**Scotty F. PAYNE, Staff Sergeant
U.S. Army, Appellant.**

No. 96–0403.
Crim.App. No. 9302143.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 6, 1996.

Decided Sept. 11, 1997.

Sullivan, J., filed concurring opinion.

For Appellant: *Captain John M. Head* (argued); *Lieutenant Colonel Michael L. Walters* and *Major J. Frank Burnette* (on brief); *Colonel Stephen D. Smith, Lieutenant Colonel John T. Rucker,* and *Captain Richard E. Burns.*

For Appellee: *Captain Thomas N. Auble* (argued); *Colonel John M. Smith, Lieutenant Colonel Eva M. Novak,* and *Captain Virginia G. Beakes* (on brief); *Captain Jinny Chun.*

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officer and enlisted members at Fort George G.

Meade, Maryland, convicted appellant, contrary to his pleas, of rape, in violation of Article 120, Uniform Code of Military Justice, 10 USC § 920. Appellant pleaded guilty by exceptions to a charge of false swearing, in violation of Article 134, UCMJ, 10 USC § 934, but he was convicted of that offense as charged. The adjudged and approved sentence provides for a dishonorable discharge, confinement for 10 years, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence without opinion.

Our Court granted review of the following issue:

> WHETHER THE MILITARY JUDGE ERRED BY DENYING THE DEFENSE MOTION TO SUPPRESS APPELLANT'S STATEMENTS TO SPECIAL AGENT GILLESPIE.

We hold that the military judge did not err in denying the motion.

### Factual Background

Appellant was an intelligence analyst assigned as noncommissioned officer-in-charge of his unit's intelligence section at Fort Carson, Colorado. On August 23, 1991, he was accused of raping a 13–year–old girl in his barracks room. In a sworn statement given to agents of the U.S. Army Criminal Investigation Command (CID) at Fort Carson on August 23, 1991, he admitted having the girl in his room but denied having sexual intercourse with her. He was "flagged" and his security clearance was suspended. Appellant testified that because he was "flagged," he was ineligible for promotion, reassignment, Army schools, "or anything of that nature."

Appellant consulted with a defense counsel, Captain (CPT) Hanchey, about the rape allegation. On advice of CPT Hanchey, appellant twice declined to take a CID-requested polygraph examination. After the CID took blood and saliva samples from appellant, his commander lifted the "flag," permitting appellant to be reassigned.

Appellant was reassigned to Korea in January 1992, but his security clearance remained suspended. Although he was assigned to a military intelligence unit, he could not work in his specialty without a security clearance.

On March 19, 1992, the CID at Fort Carson was advised by a trial counsel at Fort Carson that "there was sufficient evidence to believe [appellant] committed the offenses of Rape and False Swearing." Notwithstanding this evaluation of the evidence, appellant testified that, after his arrival in Korea, his commander received a copy of the report of investigation saying that the case was closed. Appellant's security clearance remained suspended. The record does not reflect any further criminal investigation or prosecutorial action until the current charges were preferred.

While still in Korea, appellant submitted a request for revalidation of his security clearance. The date of this request is not reflected in the record. Appellant's request was sent by the Army to the Defense Investigative Service (DIS), whose primary mission is conducting personnel security investigations. The DIS mission does not include law enforcement, but DIS agents are required to report "new information" regarding crimes to the appropriate law enforcement agencies.

Appellant's file was transmitted to Special Agent (SA) Rankin, a DIS investigator. SA Rankin is a civilian employee of the Government. He does not adjudicate requests for security clearances but merely gathers and submits information to the adjudicating authority. SA Rankin reviewed appellant's personnel security questionnaire (PSQ) that appellant had completed when he requested revalidation of his security clearance. SA Rankin conducted a "subject interview" with appellant on April 27, 1993. SA Rankin testified that the interview was "a voluntary interview" in a noncustodial setting at appellant's workplace. SA Rankin testified that he had "no indication of current representation," but that appellant told him that "he was represented previously" by a military lawyer from Fort Carson. SA Rankin did not ask appellant if "he was still represented by counsel."

SA Rankin testified that the main focus of the interview was not on the rape allegation

but on the "periodic reinvestigation at the request of the Army." SA Rankin reviewed appellant's PSQ with him "piece by piece" to verify the accuracy of all entries. SA Rankin testified that "the rape allegation was only a portion of that interview." Several "discrepancies" in the PSQ were discussed during the interview, including an arrest for an assault on a former girl friend, a former residence that appellant had not listed on the form, and the unresolved rape allegation at Fort Carson. SA Rankin testified that "it looked like the CID had done an intensive investigation and then at some point decided to stop," but the file did not reflect the "ultimate resolution of the case."

The DIS regarded the rape allegation at Fort Carson as "not resolved." Appellant had told SA Rankin that he did not have intercourse with the girl. SA Rankin testified that he offered appellant a polygraph examination as "sort of a tool for him to exonerate himself of further suspicion regarding that allegation." SA Rankin testified that he is "trained to offer the polygraph" examination "whenever there is an allegation that has not been resolved." Appellant told SA Rankin that he had declined an earlier opportunity to take a polygraph on the advice of his lawyer, but, to SA Rankin's surprise, appellant accepted SA Rankin's offer to arrange for a polygraph examination.

The case was transmitted to SA Gillespie, a DIS polygraph examiner. She testified that she is involved only in "issue cases" where there are "open allegations that cannot be resolved through interviewing references, the subject, or reviewing records." She interviewed appellant on July 27, 1993.

On the morning of the polygraph examination, before appellant arrived, Sergeant First Class (SFC) Roberts, appellant's supervisor, called SA Gillespie and told her that he did not want appellant to take the polygraph examination. SA Gillespie told SFC Roberts "that his call was an improper intrusion in the security-clearance process." She reported the call to SFC Roberts' supervisor. When appellant arrived, SA Gillespie told him about her conversation with SFC Roberts.

SA Gillespie testified that earlier she told appellant that she "understood that he had agreed to take a polygraph examination" and she "again reminded him that it is voluntary." She testified that on the day of the examination she advised appellant orally and in writing of his rights under the Privacy Act, his right to remain silent, and his right to counsel. At her request, appellant read the written advice back to her. She obtained appellant's written consent to the polygraph examination.

SA Rankin's request for a polygraph examination referred to CPT Hanchey as appellant's "former attorney," and appellant "referred to him as his 'former attorney.'" The record does not reflect that SA Gillespie made any effort to contact CPT Hanchey before interviewing appellant.

During the pretest interview, appellant told SA Gillespie that he had lied to SA Rankin by denying that he had sexual intercourse with the alleged victim. Appellant told SA Gillespie that he had sexual intercourse, but that the girl was a "willing participant." SA Gillespie then told appellant that a polygraph examination was necessary on the question whether "there was force involved in the sexual relations."

Appellant submitted to the polygraph examination. SA Gillespie testified that appellant did not invoke his rights at any time. After completing the examination, SA Gillespie concluded that appellant had not been truthful regarding the question of force. She testified that she told appellant, "[Y]ou haven't passed the test and you told me that you were going to be one hundred percent honest with me today and now we both know that you haven't been." SA Gillespie told him she "was willing to stay there all day with him if that's how long the interview took but [she] wasn't going to waste [her] time if he was going to play games." She told appellant she wanted him to start over and tell her details of what had happened in the barracks. Appellant told SA Gillespie that the girl was participating and that "she didn't fight too much." SA Gillespie pointed out the contradiction between appellant's earlier statement that the girl did not resist and his

most recent statement that "she didn't fight too much." She again told appellant that she was not "going to waste [her] time if he was going to play these games." Finally, appellant admitted forcibly removing the girl's shorts and having intercourse with her. Appellant told SA Gillespie that the girl "was still fighting against him when the penetration began," but that "during the course of the sexual intercourse, there was a time that he felt that she stopped fighting against him" and "that at that time he even felt that she was a willing participant." SA Gillespie testified that appellant told her he had lied to CID, his command, and SA Rankin because he was scared.

SA Gillespie asked appellant if he was willing to provide a written statement, and he agreed. SA Gillespie testified that appellant asked if the CID would see the polygraph results, and she told him that they could. She did not recall appellant's making any response to that answer, but he still did not invoke his rights.

SA Gillespie testified that she offered appellant the option of writing down his answers to her questions or having her write down his answers. Appellant chose the latter option. She wrote out a statement in longhand, and appellant reviewed it. Appellant made several changes. For example, SA Gillespie wrote, "I raped her," but appellant objected to the word "rape," so SA Gillespie described the forcible sexual intercourse without using the word "rape." After appellant approved her handwritten draft, SA Gillespie typed it and made minor changes after appellant again reviewed it. SA Gillespie testified that, after appellant approved the final draft of his statement, she read aloud the Privacy Act advisement, advising appellant that "it was voluntary to provide information to us and that the information given would be kept within our agency but that it could be given to federal officials or law enforcement officials." In the presence of another agent, SA Orndorff, appellant signed the statement, initialed a correction, and swore to its truth. In his written statement, appellant admitted that the girl resisted when he tried to remove her shorts and that "[s]he was still fighting me when I got on top

of her and put my penis in her vagina." He also admitted that he "intentionally falsified [m]y verbal and written statements to CID, my Command, and to DIS concerning the sexual contact with" the girl.

Appellant testified on the motion to suppress. He testified that he initiated the request for a security clearance update, but that he "had no choice" because his career as a military intelligence analyst could not continue without a security clearance. He testified that he felt he had a choice whether to talk to SA Rankin, but that he had no choice with SA Gillespie, whom he described as "overbearing." Appellant testified that SA Rankin advised him that the polygraph examination was voluntary, but that SA "Gillespie never really explained to [him] that it was voluntary." Appellant admitted lying to SA Rankin.

Appellant testified that SA Gillespie told him that she was prepared to stay all day to get the truth. He testified that he did not read the written statement and that SA Gillespie did not read it to him. He testified that he signed the statement without reading it because "I was frustrated and I had no idea that I was signing a document that said that I raped someone."

The military judge made extensive findings of fact concerning the motion to suppress. He found that the purpose of the DIS investigation "was to determine whether or not the accused was suitable for a security clearance" and "not for the purpose of perfecting a criminal prosecution." He found that SA Rankin and SA Gillespie were "civilian employees of the Department of Defense and were not employed by or under the direction of military authorities other than in a general sense in belonging to the Department of the [sic] Defense." He found that "[t]hey made no coordination with unformed [sic] police agencies concerning these offenses, had no guidance from uniformed police agencies, had no directives or requests for assistance from uniformed police agencies or authorities, [and] are not active agents for a military unit or a person subject to the Code." The military judge found that appellant "was not in

custody nor could he reasonably believe himself to be [in] custody, nor was he in any way deprived of his freedom of action in any significant manner in any of the interviews." He found that SA Gillespie complied with Article 31, UCMJ, 10 USC § 831, and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that appellant "knowingly, intelligently, and freely waived his rights."

The military judge found that appellant "was 28 years old, ... a Staff Sergeant in the United States Army, a high school graduate with some college education; his GT score is 103; he had previously served overseas in Europe, and had been on active duty for approximately 9 and a half years."

Regarding the interview by SA Gillespie, the military judge found that it "began at about 0800 hours and concluded about 1400 hours, included three breaks to include an offer of a luncheon break, which the accused declined." He found that appellant "appeared to be in good physical condition" and "not under the influence of drugs or alcohol." He found no threats, force, promises, undue influence, "or any other type of coercion." He specifically found "no ... credible evidence of psychological coercion."

The military judge found that appellant had twice been advised not to submit to a polygraph examination and that appellant understood that the polygraph examination was voluntary. He found that SA "Gillespie perhaps asked pointed questions or perhaps even used at times leading questions," but her questions "were not overreaching" and did not "constitute undue influence." Finally, the military judge found "no credible evidence that the statement eventually rendered by the accused was in any way, shape, or form a fabrication by Special Agent Gillespie."

Regarding the failure of SA Rankin and SA Gillespie to contact CPT Hanchey before interviewing appellant, the military judge found "that the Agents were not subject to the Code in the sense of [Mil.R.Evid.] 305(e)," Manual for Courts–Martial, United States (1994 ed.).

Appellant now argues that his statements to SA Gillespie were obtained in violation of the version of Mil.R.Evid. 305(e) then in effect, because his lawyer, CPT Hanchey, was not notified and given an opportunity to be present at the interview. Appellant further argues that his purported waiver of his right to counsel was invalid because it was not knowing and intelligent. The Government answers that: (1) Mil.R.Evid. 305(e) was inapplicable because the interview was by civilian agents conducting a non-criminal security background investigation; (2) the interrogator did not know and could not reasonably have known that appellant was represented by counsel; (3) the Fifth and Sixth Amendments were not violated because appellant was not in custody, and no charges had been preferred; and (4) appellant waived his right to counsel by initiating the request for revalidation of his security clearance and agreeing to discuss the unresolved rape allegation at the DIS interview.

*Discussion*

Appellant argues that his statement to SA Gillespie should have been suppressed because she did not notify CPT Hanchey of her intended interrogation and give him a reasonable time to attend. Because SA Gillespie made no effort to contact CPT Hanchey, appellant argues that his statement was "involuntary" and should have been suppressed. The Government argues that SA Gillespie had no duty to notify CPT Hanchey.

Article 31 provides in pertinent part as follows:

(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

The version of Mil.R.Evid. 305(e) in effect when appellant was tried provided as fol-

lows: [1]

"When a person subject to the code who is required to give warnings under subdivision (c) intends to question an accused or person suspected of an offense and knows or reasonably should know that counsel either has been appointed for or retained by the accused or suspect with respect to that offense, the counsel must be notified of the intended interrogation and given a reasonable time in which to attend before the interrogation may proceed."

The applicable version of Mil.R.Evid. 305(e) was "taken from *United States v. McOmber,* 1 MJ 380 (CMA 1976)." Drafters' Analysis of Mil.R.Evid. 305(e), Manual, *supra* at A22–15. In *McOmber* this Court held as follows:

[O]nce an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(d) of the Uniform Code.

1 MJ at 383.

Five subsidiary issues are included in the granted issue: (1) was SA Gillespie a "person subject to the code who is required to give warnings under" Article 31? (2) was she required to give Article 31 warnings to appellant under the circumstances of this case? (3) was there an existing lawyer-client relationship between CPT Hanchey and appellant at the time of appellant's interview by SA Gillespie? (4) did SA Gillespie know, or should she reasonably have known, that CPT Hanchey was appellant's counsel? and (5) did appellant validly waive his right to counsel?

■ The military judge denied the motion to suppress on the ground that SA Gillespie was not required to notify CPT Hanchey because she was not a person "subject to the code" who is required to give Article 31 warnings. We hold that the military judge did not err.

Although none of the jurisdictional categories in Article 2, UCMJ, 10 USC § 802, apply to SA Gillespie, appellant relies on the statement in *United States v. Quillen,* 27 MJ 312, 314 (CMA 1988), that the warning requirement in Article 31(b) applies to a civilian investigator under the following circumstances:

(1) When the scope and character of the cooperative efforts demonstrate "that the two investigations merged into an indivisible entity"; and

(2) when the civilian investigator acts "in furtherance of any military investigation, or in any sense as an instrument of the military[.]"

(Citations omitted.)

In several earlier decisions, this Court has said that the question whether military and civilian "investigations merged into an indivisible entity" is a question of fact. *See United States v. Penn,* 18 USCMA 194, 199, 39 CMR 194, 199 (1969), quoting *United States v. Swift,* 17 USCMA 227, 232, 38 CMR 25, 30 (1967); *United States v. Aau,* 12 USCMA 332, 337, 30 CMR 332, 337 (1961); *see also United States v. Plante,* 13 USCMA 266, 271–72, 32 CMR 266, 271–72 (1962) (whether French police acted as agent of American investigators was question of fact). There may be a question whether these earlier decisions treating the agency question as one of fact remain viable in light of subsequent amendments to the UCMJ, adoption of the Military Rules of Evidence, and recent Supreme Court cases announcing a *de novo* standard of appellate review for constitutional issues. *See, e.g., Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (*de novo* review of probable-cause and reasonable-suspicion determinations); *Thompson v. Keohane,* 516 U.S. 99, 102, 116 S.Ct. 457, 460, 133 L.Ed.2d 383 (1995) (*de novo* review of question whether a suspect was "in custody" at time of interrogation). We need not decide, however, whether a *de novo* standard of review or a more deferential "clearly-erroneous" standard applies in

---

**1.** Appellant's court-martial ended on December 16, 1993. Mil.R.Evid. 305(d) and (e) were amended by Executive Order No. 12936, dated November 10, 1994, effective December 9, 1994, reprinted in Manual for Courts–Martial, United States (1995 ed.) at A25–23.

this case, because we would uphold the military judge's ruling under either standard.

 In determining whether a civilian investigator is "acting as an instrument of the military," a key factor is the "degree of control" exercised by military authorities over the civilian investigator. *See United States v. Moreno,* 36 MJ 107, 117 (CMA 1992); *United States v. Lonetree,* 35 MJ 396, 405 (CMA 1992); *Quillen,* 27 MJ at 314; *Penn,* 18 USCMA at 201, 39 CMR at 201; *United States v. Holder,* 10 USCMA 448, 450–51, 28 CMR 14, 16–17 (1959). A duty to report criminal information does not necessarily make the reporting official "an instrument of the military." *United States v. Raymond,* 38 MJ 136, 139 (CMA 1993); *see Lonetree,* 35 MJ at 404.

Previous decisions of this Court have required more than a cooperative relationship between civilian investigators and military authorities. *See Lonetree,* 35 MJ at 404; *Aau,* 12 USCMA at 337, 30 CMR at 337. In *Quillen,* for example, we held that a civilian store detective employed by the Army and Air Force Exchange Service was required to give Article 31(b) warnings to a shoplifting suspect because the civilian detective's questioning of the suspect "was at the behest of military authorities and *in furtherance of their duty to investigate crime at base exchanges.*" 27 MJ at 314–15 (emphasis added).

The record shows that SA Gillespie and SA Rankin were not employed by or acting under the direction of military authorities. They were employed by DIS, a civilian agency outside the Department of the Army. They were not engaged in law enforcement activities. *See Lonetree,* 35 MJ at 404. They worked under the supervision of a separate chain of command within DIS, followed procedures prescribed by DIS, and reported only to their DIS supervisors. Unlike the store detectives in *Quillen,* their investigation was not undertaken for the purpose of investigating crime in the Army. *See United States v. Lonetree, supra.*

In this case the CID investigation ended before appellant's request to reinstate his security clearance. There was no ongoing CID investigation when DIS entered the picture. The DIS investigation was initiated because of appellant's request for revalidation of his security clearance, not because of a request from CID or any military authority. The record shows no cooperation or coordination between CID and DIS, beyond CID's release of its internal records. The DIS investigation had a different purpose and much broader scope, covering appellant's entire personal history to determine his suitability for a security clearance. *See Lonetree,* 35 MJ at 403–04 (CIA's "damage assessment did not merge" into NIS' criminal investigation); *Penn,* 18 USCMA at 201, 39 CMR at 201 (Secret Service investigation into forgery of Treasury check did not merge into military investigation of larceny of Treasury check); *Swift,* 17 USCMA at 232, 38 CMR at 30 (German police investigation to determine whether to relinquish jurisdiction did not merge into OSI homicide investigation).

Finally, even if we assume, *arguendo,* that SA Gillespie was "a person subject to the code," the record shows that in this situation she was not acting in a law enforcement or disciplinary capacity and, thus, was not required to give Article 31 warnings. *See United States v. Bowerman,* 39 MJ 219 (CMA 1994); *Raymond,* 38 MJ at 138–39; *Moreno,* 36 MJ at 114, 115; *Lonetree,* 35 MJ at 402 n. 4; *United States v. Moore,* 32 MJ 56, 60 (CMA 1991).

Since SA Gillespie had no duty to warn appellant of his rights under Article 31, the duty to notify counsel under Mil.R.Evid. 305(e) was not triggered. Accordingly, we need not decide whether CPT Hanchey was still appellant's counsel or whether SA Gillespie knew or reasonably should have known that CPT Hanchey was appellant's counsel. Likewise, we need not decide whether the 20–month break and 2 reassignments were a sufficient hiatus to obviate the requirement to contact CPT Hanchey. *See United States v. Vaughters,* 44 MJ 377, 378 (1996) (right to counsel not violated by police-initiated questioning after 19–day break in custody).

■ We turn finally to the question whether appellant validly waived his rights before making his inculpatory statement to SA Gillespie. The military judge found that he "knowingly, intelligently, and freely waived his rights." The ultimate question of the voluntariness of a confession is an issue of law, *United States v. Martinez*, 38 MJ 82, 86 (CMA 1993), reviewed *de novo, United States v. Kosek*, 41 MJ 60, 63 (CMA 1994).

We hold that the military judge did not err by concluding that appellant's confession was voluntary. The record reflects that appellant was an intelligent and experienced noncommissioned officer. He twice declined polygraph examinations on advice of CPT Hanchey. SA Gillespie told him that his supervisor, SFC Roberts, did not want him to take the DIS polygraph. She advised him orally and in writing of his right to decline the polygraph, and yet he agreed to take it. She advised him of his rights under the Privacy Act, the Fifth Amendment and Article 31, and *Miranda v. Arizona, supra,* and he voluntarily waived them. Considering "the totality of all the surrounding circumstances," we conclude—as did the military judge—that appellant's statement to SA Gillespie was voluntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973); *see United States v. Bubonics,* 45 MJ 93, 94 n. 2 (1996).

### Decision

The decision of the United States Army Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges CRAWFORD and EFFRON concur.

SULLIVAN, Judge (concurring):

Appellant at trial and on appeal has lodged numerous legal objections to admission of his confession at his court-martial. In my view, use of "abuse-of-discretion" terminology to argue one or more of those claims does not accurately respond to the standard of review which this Court employs in reviewing suppression motions denied by military judges. *See generally* S. Childress and M. Davis, 2 *Federal Standards of Review* 11–12 to 11–13 (2d ed. 1992). A military judge has no dis-

cretion to admit an involuntary confession or one taken in violation of Article 31, Uniform Code of Military Justice, 10 USC § 831; or one prohibited by our decision in *United States v. McOmber,* 1 MJ 380 (1976), or the version of Mil.R.Evid. 305 (e), Manual for Courts–Martial, United States, 1984, in effect at the time of trial; or one taken in violation of the Fifth or Sixth Amendment.

Admittedly, in *United States v. Ayala,* 43 MJ 296, 298 (1995), this Court employed this umbrella term in the suppression context. However, it specifically defined this term to include clearly-erroneous factfinding review and *de novo* legal determinations, which definition also applies to mixed questions of fact and law. I agree that these particular standards of review are appropriate for determining suppression-motion appeals. *See United States v. Yusuff,* 96 F.3d 982, 987–88 (7th Cir. 1996). However, I do not believe "abuse of discretion" adequately captures the full breadth of the legal review required of this Court on such matters. *See* Childress and Davis, *supra,* § 11.02 at 11–6 ("discretion is an elusive idea, and is hard for the mind to embrace or apply in a coherent way"). On resolution of the legal questions raised in a suppression motion, we do not defer to a military judge's discretion

Turning to appellant's particular arguments in this case, I agree with the majority that appellant's statements to these Defense Investigative Service investigators were voluntary. *Cf. United States v. Martinez,* 38 MJ 82, 86 (CMA 1993) (*de novo* standard). Moreover, I also agree that Article 31 was not applicable in this case because appellant was not questioned by a person acting in a law enforcement or disciplinary capacity. *See United States v. Bowerman,* 39 MJ 219, 221 (CMA 1994) (clearly–erroneous standard or *de novo* standard). Also, as a matter of law, I conclude that the version of Mil. R.Evid. 305 (e) in effect at the time of trial, is not applicable in this case because his questioners were not required to give warnings under Article 31.

Finally, the decision of this Court in *United States v. McOmber, supra,* does not render appellant's confession inadmissible. *See*

*United States v. LeMasters*, 39 MJ 490 (CMA 1994). This Court has not chosen to expand *McOmber* to situations where the accused voluntarily initiates further questioning without his counsel being present.