UNITED STATES, Appellee

v.

Robert W. PINSON III, Senior Airman
U.S. Air Force, Appellant

No. 01-0466

Crim. App. No. 32963

United States Court of Appeals for the Armed Forces

Argued October 25, 2001

Decided June 19, 2002

CRAWFORD, C.J., delivered the opinion of the Court, in which GIERKE, EFFRON, and BAKER, JJ., joined. SULLIVAN, S.J., filed an opinion concurring in the result.

Counsel

For Appellant: Lieutenant Colonel Timothy W. Murphy (argued); Lieutenant Colonel Beverly B. Knott (on brief); Colonel James R. Wise.

For Appellee: Captain Adam Oler (argued); Colonel Anthony P. Dattilo and Major Lance B. Sigmon (on brief).

Military Judge: J. Jeremiah Mahoney

**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.**

Chief Judge CRAWFORD delivered the opinion of the Court.

Contrary to his pleas, appellant was convicted at a general court-martial by military judge alone of disobeying a no-contact order (one specification), assault (two specifications), subordination of perjury at a prior trial (one specification), and communicating threats (three specifications), in violation of Articles 92, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 USC §§ 892, 928, and 934. He was also found guilty, pursuant to his pleas, of adultery, in violation of Article 134. The convening authority approved the sentence of a bad-conduct discharge, three years' confinement, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. 54 MJ 692 (2001).

Appellant raises two issues on appeal before this Court:

I.

> WHETHER THE MILITARY JUDGE ERRED IN DENYING A
> DEFENSE MOTION FOR APPROPRIATE RELIEF AFTER THE
> GOVERNMENT SEIZED AND REVIEWED ATTORNEY/CLIENT
> PRIVILEGED MATERIAL AND THAT MATERIAL WAS
> SUBSEQUENTLY USED IN THE INVESTIGATION OF
> APPELLANT.

II.

> WHETHER THE MILITARY JUDGE ERRED IN FAILING TO
> SUPPRESS APPELLANT'S PRETRIAL STATEMENTS TO
> ICELANDIC AUTHORITIES TAKEN DURING A JOINT
> INVESTIGATION, IN VIOLATION OF HIS FOURTH
> AMENDMENT AND ARTICLE 31, UCMJ, RIGHTS, AND
> BECAUSE THE STATEMENTS WERE INVOLUNTARY.

United States v. Pinson, No. 01-0466/AF

For the reasons set forth herein, we resolve both issues against appellant and affirm.

FACTS – ISSUE I

At appellant's first trial in February 1996, Helga Kristen Helgadottir, the victim, perjured herself by testifying that her earlier accusations concerning appellant's assault and property damage were false, and that the property in question belonged to appellant, not herself. On April 1, 1996, the victim told the civilian police that appellant had procured her perjured testimony by beating and threatening her. To support her allegation, she provided several letters from appellant that included the alleged threats.

Based on this complaint, both the Icelandic police (IP) and the Naval Criminal Investigative Service (NCIS) opened separate investigations. NCIS agents Lockart and Green, and Master Sergeant DeRoy from the Provost Marshal's Office, obtained an authorization to search appellant's quarters. "An Icelandic investigator [Superintendant Björn Bjarnasson] was present when the NCIS searched the appellant's quarters, but only as an observer." 54 MJ at 697. This search resulted in the seizure of several notebooks containing appellant's writings and comments about the victim. It is a portion of these seized materials that is alleged to be the attorney-client privileged material.

3

As found by the military judge and affirmed by the Court of Criminal Appeals, "[n]o privileged document was used as direct evidence in the appellant's court-martial." Id. at 696. In particular, the military judge found that the documents and appellant's writings were properly seized by NCIS agents, who were investigating appellant for subornation of perjury at his first court-martial. The documents were temporarily given to the Icelandic police for their use in pursuing separate charges involving threats and assaults by appellant on Ms. Helgadottir. None of the investigators recognized any of the documents or writings as potentially privileged instruments.

Prior to their discovery by a trial counsel, Captain Floyd, on April 26, 1997, over a year after their seizure, none of the documents had ever been positively identified as privileged communications by anyone. Although both American and Icelandic investigators looked at the seized material, only one, IP Superintendent Bjarnasson, read the papers for content. Mr. Bjarnasson did not find any information to be helpful in his investigation. Accordingly, except as noted below, none of the documents were in any way used to advance either the Air Force's or IP's investigation against appellant.

The judge examined all of the exhibits, and they were subsequently marked either "P" for privileged or "NP" for non-privileged. Appellant puts in issue six exemplars, identified

4

as "six sides of four [spiral notebook] pages, identified as

NP67, NP68, NP70, NP74, P27 and P28," that were seized and

submitted for comparison as known handwriting exemplars. The

exhibits NP67, NP68, NP70, and NP74 were found to be part of

appellant's clemency package after his first trial. Thus, there

was no privilege. Counsel also stipulated that these documents

were not privileged. Therefore, this case revolves around two

documents, P27 and P28. The defense contends that the mere

comparison of P27 and P28 to other exemplars resulted in the

disclosure of privileged information, violating appellant's

Sixth Amendment rights. Citing Weatherford v. Bursey, 429 U.S.

545, 554 (1977), appellant continues that when there is an

intentional government intrusion, the evidence obtained may not

be used directly or indirectly. See also Mil.R.Evid. 502(b)(4),

Manual for Courts-Martial, United States (2000 ed.).[1]

There is no finding by either the military judge or the Court

of Criminal Appeals that the questioned documents were examined

for any purpose other than to identify appellant's handwriting.

More importantly, the military judge found

> that to the extent P27 and P28 might at one time
> [have] been protected by M.R.E. 502, their contents
> have been fully disclosed in communications to
> others, including those communications in
> [Appellate Exhibit (App Ex)] XXV [Memorandum for
> Convening Authority (8 AF/CC) dated Mar. 18, 1996],
> App Ex XXVII [Congressional Complaint dated Nov.
> 16, 1996], and App Ex XXVIII [Memorandum for 85th

---

[1] All Manual provisions are identical to the ones in effect at the time of appellant's court-martial.

> Group Inspector General dated July 5, 1996].
> Moreover, none of the material contained in P27 and
> P28 was susceptible to being used directly or
> indirectly against the accused on the charges in
> this case.  Moreover, the questioned documents
> examiner testified that those items were not
> necessary for his conclusion, and disregarding them
> would not affect the certitude of his opinion.
> Finally, the court rules as a matter of law that
> mere comparison of the physical appearance of the
> accused's lawfully seized handwriting is not -- in
> this case  -- within the protection of the attorney
> client privilege.

However, to ensure that there was no taint, Major Thompson, Special Trial Counsel, represented the Government on the issue of the privileged information.  Appellant concedes that there was no privileged evidence used directly against him at trial.  Appellant contends, however, that documents P27 and P28 were privileged and that these documents were indirectly produced at trial.  The claim of indirect production is based upon appellant's suggestion that these documents may have been discussed between two IP officers, and that these documents were used in a handwriting analysis.  In that context, according to appellant, the military judge's finding that there was "no use of the material" is clearly erroneous. Appellant also argues that since Captain Altschuler, a trial counsel at his first court-martial, examined some of the privileged documents in June 1996, the military judge's findings were also clearly erroneous.

The court below and the military judge found that the seizure of any privileged documents by the Government was pursuant to a lawful search and seizure, there was no intentional seizure of privileged communications, and the information was not used to the detriment of appellant.

DISCUSSION - ISSUE I

> This is not a case of dual roles being performed by defense counsel or outrageous conduct by the Government. Both Congress ... and this Court have gone to great pains to ensure to servicemembers the right to counsel. This right to a lawyer appointed free of charge ... applies at the pretrial stage, see, e.g., Mil.R.Evid. 305(d)(1)(A), 305(e), 321(b)(2); trial stage, see, e.g., Art. 27 [,UCMJ, 10 USC § 827]; post-trial stage and even the appellate stage, see, e.g., United States v. Palenius, 2 MJ 86 (CMA 1977). A concomitant right is the right to confidential communications between the attorney and client. Mil.R.Evid. 502. Any exception to this rule must ensure that there is no chilling effect on defendants freely speaking with their military lawyers. See Grady v. Darley, 44 MJ 48 (Summary disposition 1996).

United States v. Godshalk, 44 MJ 487, 490 (1996); cf. United States v. Smith, 35 MJ 138, 140-41 (CMA 1992)(defense counsel may be called as prosecution witness when the accused gave counsel a fabricated document for use at trial).

The Supreme Court has addressed interference with the attorney-client privilege on numerous occasions. In Weatherford v. Bursey, supra, the Court refused to adopt a per se rule that any interference with the attorney-client privilege required the drastic remedy of reversal. The Supreme Court reversed the

7

Court of Appeals, which held that "whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial."  528 F.2d 483, 486 (4th Cir. 1975).

Bursey and Weatherford, an undercover agent, were arrested in 1970 for breaking into a Selective Service Office on two occasions.  While Weatherford was still maintaining his undercover status, he was invited to meet with Bursey and his attorney twice.  On neither of the occasions did he seek information from Bursey or his attorney.  The purpose of the meetings was to obtain information, ideas, or suggestions as to Bursey's defense for breaking into the Selective Service Office. Weatherford did not discuss with his superiors or the prosecuting attorney "any details or information regarding [Bursey's] trial plans, strategy, or anything having to do with the criminal action pending against [Bursey]."  429 U.S. at 548.

Based on the facts in Weatherford, the Supreme Court said an undercover agent meeting with a criminal defendant and his lawyer does not require reversal.  Id. at 551.

> [I]f an undercover agent meets with a criminal
> defendant who is awaiting trial and with his
> attorney and if the forthcoming trial is discussed
> without the agent's revealing his identity, a
> violation of the defendant's constitutional rights
> has occurred, whatever was the purpose of the agent
> in attending the meeting, whether or not he
> reported on the meeting to his superiors, and

8

> whether or not any specific prejudice to the
> defendant's preparation for or conduct of the trial
> is demonstrated or otherwise threatened.

Id. at 550.  Nonetheless, the Weatherford Court stated that its prior cases "individually or together" did not require or suggest a per se rule of reversal in such a situation.  Id. at 551.

The Supreme Court noted that "Bursey would have [had] a much stronger case" if either (1) "Weatherford [had] testified at Bursey's trial as to the conversation between Bursey and [his attorney]"; (2) the "State's evidence [had] originated in these conversations"; (3) the "overheard conversations [had] been used in any other way to the substantial detriment of Bursey"; or (4) "the prosecution [had] learned from Weatherford ... the details of the ... conversations about trial preparations."  Id. at 554. But the Court found "[n]one of these elements ... present here." Id. at 555.  Thus, the Court held that there was no violation of the Sixth Amendment.  However, the invasion that took place in Weatherford had significant investigative justification.

Likewise, in Hoffa v. United States, 385 U.S. 293 (1966), when an undercover agent was present during the attorney-client conversation, the Court held that there was no violation of the defendant's rights because the substance of the lawyer-client conversations was not communicated or used at trial.  Even so, we must always ask whether the invasion impacted on the

attorney's performance or resulted in the disclosure of privileged information at the time of trial.

While Weatherford had to maintain his undercover identity, the Supreme Court addressed an unjustified invasion into the attorney-client relationship in United States v. Morrison, 449 U.S. 361 (1981).  DEA agents, who knew that the defendant was represented by an attorney, met with Morrison without defense counsel's knowledge or permission.  The Court of Appeals held that the defendant's right to counsel had been violated, irrespective of the lack of proof of prejudice to her case.  The Supreme Court said that assuming there was prejudice, any action taken had to be "tailored to the injury suffered."  Id. at 364. Since "respondent has demonstrated no prejudice of any kind, either transitory or permanent, to the ability of her counsel to provide adequate representation in these criminal proceedings," there was "no justification"for such "drastic relief" as a dismissal with prejudice.  Id. at 366-67.

> [A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate....  The remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression.

Id. at 365-66 (footnotes omitted).

Here, appellant has not carried his burden to show intentional or outrageous government misconduct, such as having no basis for a search, or that he was prejudiced by the

10

disclosure of information.  This case is more like Weatherford
than Morrison because there was a legitimate search of
appellant's quarters to obtain evidence of his alleged
subornation of perjury at the first trial.  There was no direct
interference with the attorney-client relationship.  See, e.g.,
Geders v. United States, 425 U.S. 80 (1976).  Appellant concedes
that no direct evidence was used at trial.  While he argues that
the two privileged documents were used to analyze his
handwriting, an individual has no expectation of privacy in his
handwriting.  United States v. Fagan, 28 MJ 64, 66 (CMA 1989).

Finally, a review of the record shows that the Government's
case was based on independent evidence.[2]  Accordingly, we hold
that the military judge's decision was not an abuse of
discretion.

### FACTS - ISSUE II

After receiving the report from Ms. Helgadottir, the
Icelandic police attempted to locate appellant.  Before the
interrogation began, the Icelandic authorities gave appellant's
name to the NCIS and asked that he be made available.  When he
arrived at the Naval Security Building, appellant was arrested
by Mr. Bjarnasson and advised of his right to an attorney and
his right to remain silent.  He invoked his right to an

---

[2] Having found that P27 and P28 were not used directly or indirectly against
appellant, we need not determine the legal significance, if any, of the
military judge's finding that these documents were subsequently disclosed
after trial in communications with others.

attorney, and the interrogation ceased until an attorney was furnished for him. In the meantime, Mr. Bjarnasson informed appellant that under the treaty agreement between Iceland and the United States, each side is required to cooperate with the other. Appellant's Icelandic attorney advised him that a negative inference can be drawn if an accused asserts his right to remain silent. Before being transported to the Icelandic facility, appellant said that he knew the Icelandic police wanted to talk to him because of Ms. Helgadottir; specifically, that she wanted her clothes and watch back. Subsequently, he decided to cooperate, and the interrogation continued there at various times over a two-month period.[3]

Mr. Bjarnasson testified that the Icelandic police did not talk to any of the NCIS agents prior to initiating their interrogation of appellant. No NCIS agent asked that the Icelandic police get certain information or that appellant be asked certain questions. The interrogation was "purely for the benefit of the Icelandic" authorities. In fact, there was no conversation involved at all with the Naval authorities as to the details of the interrogation.

Inspector Björn Sveinsson, one of the two IP interviewers, testified during cross-examination that he did not tell anyone that he was asking questions on behalf of the NCIS. His only

---

[3] There were two interrogations that took place on the 23d of April, and other interviews took place throughout April and May. Appellant's appointed

request to NCIS was for its agents to locate Eddie Barnes, a military friend of appellant who had been with appellant, the victim, and their mutual friends on several occasions.

The military judge found that two separate investigations had taken place: NCIS and the IP Department.  In particular, the military judge found that

> Icelandic Authorities ... were acting at their own behest and not as instrumentalities of US Authorities. The accused's statements to the Icelandic Authorities were taken in conformity with Icelandic Law for potential use in the prosecution in Icelandic Courts. They were not taken as a subterfuge to circumvent the accused's refusal to talk to NCIS Agents without an attorney.  Nothing in the manner of substance of taking of these statements offends the accused's right to due process in this court.

## DISCUSSION - ISSUE II

Article 31(b), UCMJ, 10 USC § 831(b), states that

> [n]o person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Article 31(b) would apply only if it is shown that the IP Department was acting as an agent of the military during its interrogations of appellant.

---

Icelandic attorney was present at most of these sessions.

In United States v. Payne, 47 MJ 37, 43 (1997), we left open the question of whether a military judge's conclusion as to whether a civilian investigation was "conducted, instigated, or participated in," Mil.R.Evid. 305(h)(2), by military authorities should be reviewed de novo or under a "clearly erroneous" standard.  In Payne, we observed:

> There may be a question whether these earlier decisions treating the agency question as one of fact remain viable in light of subsequent amendments to the UCMJ, adoption of the Military Rules of Evidence, and recent Supreme Court cases announcing a de novo standard of appellate review for constitutional issues.  See, e.g., Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)(de novo review of probable-cause and reasonable-suspicion determinations); Thompson v. Keohane, 516 U.S. 99, 102, 116 S.Ct. 457, 460, 133 L.Ed.2d 383 (1995)(de novo review of question whether a suspect was "in custody" at time of interrogation).  We need not decide, however, whether a de novo standard of review or a more deferential "clearly-erroneous" standard applies in this case, because we would uphold the military judge's ruling under either standard.

47 MJ at 42-43 (emphasis added).

Despite our recognition in Payne that changes in the legal landscape may necessitate a change in our standard of review, we need not decide at this time whether to apply a de novo standard of review or clearly erroneous standard because under either, we hold the military judge's ruling was correct.

Appellant did not meet his burden of establishing that the Icelandic investigators were acting under the control or at the direction of the Naval investigators.  Icelandic police

14

interrogated appellant in various stages over an extended period of time. At no time did the Icelandic police ask the NCIS agents for information or leads to assist the Icelandic police in conducting the investigation. The limited assistance that NCIS agents provided to the Icelandic police in this case -- such as locating appellant and American witnesses -- was undertaken pursuant to the defense agreement between the two countries, and did not constitute "participation" within the meaning of the Mil.R.Evid. 305(h)(2). Accordingly, we hold that the military judge's ruling was not in error as to Issue II.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

United States v. Pinson, No. 01-0466/AF

SULLIVAN, Senior Judge (concurring in the result):

I would affirm.

On Issue I, there was no showing of prejudice resulting to appellant from the use of the attorney-client material.  See United States v. Tanksley, 54 MJ 169, 172 (2000).

On Issue II, the facts in this case are weaker than those in United States v. French, 38 MJ 420, 428-31 (CMA 1993) (Sullivan, C.J., dissenting).  In the instant case, neither appellant's First Sergeant nor any other American military personnel played a role in the actual interrogation of appellant.  Cf. id. at 434. Moreover, the level of coordination between foreign police and military authorities was minimal compared to that in French.  Id. at 429-30.  Accordingly, there was no merger of the civilian and military investigations.