# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39485**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Austin D. WETUSKI**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 20 December 2019

————————————

*Military Judge:* Matthew D. Talcott (arraignment); Bradley A. Morris.

*Approved sentence:* Dishonorable discharge, confinement for 9 months, and reduction to E-1. Sentence adjudged 16 February 2018 by GCM convened at Francis E. Warren Air Force Base, Wyoming.[1]

*For Appellant:* Major Mark J. Schwartz, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major Anne M. Delmare, USAF; Captain Zachary T. West, USAF; Mary Ellen Payne, Esquire.

Before MINK, LEWIS, and D. JOHNSON, *Appellate Military Judges*.

Judge LEWIS delivered the opinion of the court, in which Senior Judge MINK and Judge D. JOHNSON joined.

————————————

[1] The general court-martial convening authority convened the court at this location even though the events occurred near Malmstrom Air Force Base (AFB), Montana. The convening authority made this decision, consistent with the pretrial advice of his staff judge advocate, as the named victim was a paralegal in the Malmstrom AFB legal office and several members of that office were witnesses in the case. We identify the named victim's career field in the opinion as it is necessary to resolve the assignments of error in this case.

---

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

---

LEWIS, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2,3] The court members sentenced Appellant to a dishonorable discharge, confinement for nine months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority disapproved the adjudged forfeitures and waived the mandatory forfeitures for a period of six months, or until release from confinement or expiration of term of service. The convening authority directed the mandatory forfeitures be paid to Appellant's spouse for the benefit of her and her dependent child. The convening authority approved the remainder of the adjudged sentence.

Appellant raises four assignments of error: (1) the military judge erred when he denied a motion to suppress Appellant's statements to civilian law enforcement officers; (2) the military judge improperly limited cross-examination of the victim on her character for untruthfulness and bias; (3) his conviction is legally and factually insufficient; and (4) the military judge erred by not allowing rebuttal of the victim's unsworn statement during sentencing.[4] We find no prejudicial error and affirm the findings and sentence.

## I. BACKGROUND

This case involves a sexual assault by digital penetration committed by Appellant against a junior enlisted female paralegal, A1C ME, in the back seat of a vehicle in a parking lot outside of a bar in Great Falls, Montana. The incident occurred on 18 February 2017 just after midnight. At trial, a number of friends,

---

[2] All references in this opinion to the Uniform Code of Military Justice (UCMJ), the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] The court members acquitted Appellant of one specification of abusive sexual contact of A1C ME, under Article 120, UCMJ, 10 U.S.C. § 920.

[4] The trial transcript, appellate exhibits, and briefs involving the fourth assignment of error were sealed pursuant to R.C.M. 1103A. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See* R.C.M. 1103A(b)(4).

acquaintances, and co-workers of Appellant and A1C ME testified. We will describe the perspectives of some of them later in the opinion when we address Appellant's assignments of error. After we explain how Appellant and A1C ME met, the remainder of this background section focuses on the assault itself, its immediate aftermath, and how it was reported to law enforcement.

Appellant lived in base housing on Malmstrom Air Force Base (AFB), Montana. On this particular Friday evening, 17 February 2017, he hosted several of his friends for a "pre-game" to drink alcohol before the group went out to local bars. One of Appellant's close friends, A1C CR, mostly lived at Appellant's house during this time. A1C CR invited A1C ME to attend the "pre-game." A1C ME agreed and in turn invited a few female Airmen. Appellant's wife, also enlisted and assigned to Malmstrom AFB, was not at home. A1C ME had a couple of mixed drinks at Appellant's house and could feel the effects of the alcohol but did not consider herself drunk.

When Appellant and A1C ME met, both were attracted to each other. They flirted openly while at Appellant's house. This continued unabated until A1C ME and another woman went to the bathroom. Once inside, the two women noticed the bathroom contained female hygiene products. As A1C ME exited the bathroom she asked who was married that lived in the house. Appellant raised his hand. A1C ME became very mad that a married man was "hitting on" her. She told Appellant how she felt and distanced herself somewhat from him. The entire group, including A1C ME and Appellant, finished the "pre-game" and prepared to visit local bars.

The group took two vehicles to the first bar. A1C CR drove his vehicle, and Appellant and A1C ME rode in the back seat. A1C CR's friend, A1C DW, rode in the passenger seat. A1C DW had met A1C ME before and also knew Appellant because they were in the same career field and squadron. Once inside the first bar, surveillance footage showed Appellant and A1C ME having one alcoholic drink together and talking closely. The footage also captured A1C ME dancing closely with most of the other female and male Airmen in the group including Appellant. As the group got ready to leave for a second bar, A1C ME learned that the other car was stopping first at a local gas station. A1C ME gave one of the Airmen in that car money to purchase cigarettes for her.

As before, A1C CR drove his vehicle to the second bar with A1C DW in the passenger seat and Appellant and A1C ME in the back seat. Once parked at the second bar, A1C CR and A1C DW went inside. Appellant and A1C ME stayed in the back seat. A1C ME wanted to wait for the other vehicle to arrive with her cigarettes. Appellant wanted to stay with A1C ME. The low temperature that night was between 31–32 degrees Fahrenheit. The vehicle's engine was off.

At 1159 hours, one of the Airmen riding in the other vehicle sent an Instagram message to A1C ME telling her they were at the gas station getting her cigarettes. At 0000 hours, A1C ME replied saying "thank you." At 0000 hours, that Airman messaged A1C ME telling her they were about to arrive at the second bar. At 0002 hours, that Airman messaged A1C ME that they had arrived. A1C ME replied "Okay." That Airman, who was under 21 years old, messaged "Can I get in?" as she needed A1C CR's help to get into the second bar. A1C ME did not respond.

Around this time, in the back seat, Appellant had moved closer to A1C ME. She felt anxious and uncomfortable. At 0006 hours, A1C ME texted her best friend HM asking to please be picked up.[5] HM immediately responded asking A1C ME if everything was okay. Over the next three minutes, in a series of short texts, A1C ME gave HM the name of the bar, answered "no" that she was not okay, requested that HM "please help" as she was "getting raped." At the time HM received A1C ME's texts, she was at a different bar about 10 to 15 minutes away. HM showed the texts to her boyfriend and one of his co-workers, borrowed her boyfriend's truck, and sped across town to reach A1C ME.

By this point, Appellant had taken off A1C ME's necklace, started to kiss her neck, and pulled the back of her head and hair until she was laying down on the back seat. A1C ME recalled everything happening at once with Appellant's hands all over her.

About two minutes into HM's drive across town, at 0012 hours, she called A1C ME's cellphone and A1C ME answered.[6] This call lasted three minutes. HM immediately began questioning A1C ME about her situation, but A1C ME avoided her questions completely. Instead, A1C ME queried HM about a disagreement that HM had with her boyfriend earlier in the night. HM interpreted A1C ME's non-responsiveness as A1C ME trying to create a situation where HM could come and get her.

A1C ME recalled thinking that maybe Appellant would stop if she had someone on the phone with her. Appellant was not deterred by the phone call. A1C ME remembered him pushing up her shirt and bra putting his hands on her breasts and biting her nipple.[7] Appellant began rubbing A1C ME's vagina

---

[5] A1C ME also texted A1C CS, a male friend to see if he could pick her up. He was too drunk to drive. The record of trial does not show the exact time of her text message to A1C CS.

[6] A1C ME testified that it was HM that "answered the phone." The call log from A1C ME's phone showed that only HM made outgoing calls to A1C ME.

[7] The court members acquitted Appellant of touching A1C ME's breast with his hand and his teeth without her consent.

outside her pants and then he pulled her pants down and stuck his fingers inside her vagina. A1C ME told him "no" and "stop." He did not.

During the call, HM heard A1C ME say "stop" three or four times in a "serious tone of voice." HM also heard A1C ME say the name "Austin," a name HM did not recognize. HM thought A1C ME's voice sounded "scared." HM also heard "moaning or sexual noises" from A1C ME during the call. HM was scared and upset as she continued her drive towards A1C ME.

Before HM arrived, A1C DW came out to warm up A1C CR's vehicle. A1C DW knew Appellant and A1C ME were in the back seat and did not want to interrupt anything so he pressed the lock and unlock buttons "ten times" on the vehicle's remote as he approached the car. Eventually, A1C DW opened the drivers' door and stuck his head inside to start the vehicle. A1C DW took a "two second" glance into the back seat. He could see A1C ME was on her phone appearing to text and that Appellant was just sitting there. A1C DW recalled the inside of the vehicle being fogged up. A1C DW returned to the bar. A1C ME remembered the vehicle locking and unlocking and testified that it was at that time when Appellant finally got off her. However, A1C ME testified A1C DW never entered the vehicle or started it.

Once HM arrived at the bar's parking lot, she called A1C ME again to find the location of the vehicle. This second call only took 1 minute. At this point, HM also realized that two of her male friends had followed her in a separate vehicle. HM located the vehicle and saw Appellant standing outside it. A1C ME got out of the vehicle while adjusting her shirt. HM got out of her boyfriend's truck and approached them at a fast pace. HM saw A1C ME give Appellant a "weird, like arm-hug" and then walk towards HM.

HM began yelling at Appellant that they were going to talk about what just happened. A1C ME said "no, let's go" and put her arm up to keep HM from advancing further towards Appellant. Appellant said nothing. HM thought Appellant looked mad. HM's two friends described Appellant differently. One of them thought he looked "surprised, kind of like a deer in headlights" and the other said "his head was down, and he took a step back away from us." One of HM's friends took down the license plate. That friend also saw exhaust and assumed the vehicle from which Appellant and A1C ME had just exited was running.

As HM began driving away A1C ME began crying. By the time they returned to where HM's boyfriend was A1C ME was crying so hard that she vomited next to a tree. HM gave A1C ME two options: (1) give HM a number of someone to call to report the assault; or (2) HM was going to Appellant's house "to beat the s**t out of him." A1C ME chose the first option. A1C ME told HM

she could call Captain (Capt) SA, a female judge advocate in the Malmstrom AFB legal office and former enlisted United States Marine.

At about 0100 hours, HM reached Capt SA on the phone and described what happened. In less than 10 minutes, Capt SA and her husband left their house. Within an hour, Capt SA and her husband met HM and A1C ME. Capt SA described A1C ME as "very detached and disconnected from the situation." Capt SA and her husband took A1C ME to a local hospital for a sexual assault forensic examination.[8] Capt SA also notified the Malmstrom AFB staff judge advocate (SJA), Lieutenant Colonel (Lt Col) AB, and Special Agent (SA) JF, the on-call agent from the Air Force Office of Special Investigations (AFOSI). Hospital personnel notified the Great Falls Police Department (GFPD) of the assault who in turn notified Air Force law enforcement personnel at Malmstrom AFB.

Just before 0400 hours, a GFPD patrolman interviewed A1C ME at the hospital. He reviewed A1C ME's text messages and call log with HM and photographed them. As this patrolman finished his shift, the investigation was passed to Master Patrolman OD at about 0600 hours. Master Patrolman OD had 15 years of experience on the police force and had prior service as a rotational detective.

GFPD requested the Air Force's assistance to bring A1C CR and Appellant to GFPD to be interrogated. SA JF called Appellant's acting first sergeant and requested he retrieve Appellant and A1C CR. The acting first sergeant went to Appellant's on-base house, woke up both A1C CR and Appellant, and drove them to GFPD. By this time, SA JF had also arrived at GFPD. SA JF introduced himself to Appellant, A1C CR, and the acting first sergeant in the lobby of GFPD.

Appellant and A1C CR were then taken to separate rooms. SA JF and the acting first sergeant watched and listened from an observation room. A1C CR was questioned first. After waiving his Fifth Amendment[9] rights, A1C CR confirmed the locations where he and Appellant had been the previous night. A1C CR also told GFPD that Appellant and A1C ME were in his vehicle outside the second bar for about 10 to 15 minutes.

Appellant was questioned after A1C CR. GFPD recorded and transcribed the interrogation. At trial, both the recording and the transcript of Appellant's interrogation were admitted into evidence. Prior to questioning, Appellant was read and waived his Fifth Amendment rights in writing. Appellant admitted penetrating A1C ME's vagina with his finger. He repeatedly insisted it was

---

[8] Neither party offered exam results into evidence during trial.

[9] U.S. CONST. amend. V.

consensual. Initially, Appellant said the only time A1C ME said "no" was when he asked if they could have "regular sex." Later, Appellant said that A1C ME told him to "hold on" when A1C ME's friend called. Appellant said that when he was told to "hold on" he took his hand out of A1C ME's pants and just kissed her neck. Appellant also told GFPD that he told A1C ME "if you want me to stop, say my name." Appellant admitted that A1C ME said "Austin, stop" but that she was still moaning and that he "probably took it as a sign of she's into this." Appellant also told the GFPD officers about A1C DW coming out to the car to warm it up and that A1C ME never told A1C DW to get her out of this situation.[10] During breaks in the interrogation, Master Patrolman OD and his colleague went to the observation room. SA JF provided his perspective on the interrogation and offered suggestions to Master Patrolman OD.

About halfway through the interrogation, Master Patrolman OD asked Appellant if he was willing to write A1C ME an apology letter. The apology letter was Master Patrolman's OD's idea. Appellant agreed. The GFPD officers left the room. Appellant wrote and signed the following:

> I want to apologize for the other night. I didn't take what you said seriously and I'm really sorry. Things definitely got out of hand on my part. I know it started off as mutual but I should have let you go when you were ready to leave. If it were up to me I'd be doing this apology in person because of the severity. Again, I'm really sorry I let things escalate to the point where you were uncomfortable. I know there's no way to make it up to you so hopefully you can find it in your heart to forgive me at some point. Sorry.

After Appellant wrote his apology, Master Patrolman OD asked SA JF if he wanted to question Appellant. SA JF agreed and entered the room with both GFPD officers. This portion of Appellant's questioning was also recorded, transcribed, and admitted into evidence. SA JF read Appellant his rights under Article 31, UCMJ, 10 U.S.C. § 831, which Appellant waived. During this portion, Appellant also admitted that he was "sure" A1C ME said "no" more than once, but he only heard it once.

---

[10] Master Patrolman OD did not interview A1C DW. A1C DW learned of the accusations by A1C ME against Appellant the next day from A1C CR. About a week later, A1C DW apologized to A1C ME on the phone for not knowing about what happened in the car to her.

At the conclusion of the interrogation, GFPD arrested Appellant for a violation of Montana law[11] and turned him over to the Cascade County (MT) Adult Detention Facility. Six days after the interrogation of Appellant, the Deputy County Attorney for Cascade County moved to dismiss Appellant's case without prejudice noting that Montana "relinquished jurisdiction of the case to the U.S. Air Force." A Cascade County justice of the peace granted the motion four days after it was filed clearing the Air Force to prosecute Appellant.

## II. DISCUSSION

### A. Motion to Suppress

#### 1. Additional Background

Appellant argues the military judge abused his discretion when he admitted the recording and transcript of Appellant's GFPD interrogation. In Appellant's view, SA JF's presence in the observation room and his consultation with the GFPD agents during their breaks meant that the GFPD officers were required to read him his Article 31 rights. Appellant claims the GPFD and AFOSI investigations merged into an indivisible entity at the point of his questioning and the GFPD acted as an instrument of the military in questioning Appellant. We find the military judge did not abuse his discretion in denying the Defense's motion to suppress.

#### 2. Law

We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). The military judge's findings of fact are reviewed for clear error, but his conclusions of law are reviewed de novo. *United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015) (citation omitted). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted). However, "[a] military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004). "[I]n reviewing a ruling on a motion to suppress, we consider the evidence in the light most favorable to the prevailing party." *United States v. Eppes*, 77 M.J. 339, 344 (C.A.A.F. 2018)

---

[11] Master Patrolman OD found probable cause for a violation of Montana Code § 45-5-503, Sexual Intercourse Without Consent. The term "sexual intercourse" is defined at Montana Code § 45-2-101 and includes penetration of the vulva by the penis as well as penetration of the vulva "by a body member of another person."

(alteration in original) (quoting *United States v. Macomber*, 67 M.J. 214, 219 (C.A.A.F. 2009)), *cert. denied*, __ U.S. __, 139 S. Ct. 617 (2018).

Servicemembers are generally entitled to the protections of the Fifth Amendment. *See United States v. Tempia*, 37 C.M.R. 249, 253–55 (C.M.A. 1967). The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. As "[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators . . . the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege. . . ." *Miranda v. Arizona*, 384 U.S. 436, 469 (1966).

"The protections afforded to servicemembers under Article 31(b), UCMJ, are in many respects broader than the rights afforded to those servicemembers under the Fifth Amendment of the Constitution." *United States v. Evans*, 75 M.J. 302, 303 (C.A.A.F. 2016) (citations omitted). Article 31(b), UCMJ, 10 U.S.C. § 831(b), provides:

> No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

"Thus, Article 31(b), UCMJ, warnings are required when (1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected." *United States v. Jones*, 73 M.J. 357, 361 (C.A.A.F. 2014) (footnotes omitted) (citation omitted). An "interrogation" includes "any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning." Mil. R. Evid. 305(b)(2).

Civilian investigators must read Article 31 rights "under the following circumstances: (1) When the scope and character of the cooperative efforts demonstrate that the two investigations merged into an indivisible entity; and (2) when the civilian investigator acts in furtherance of any military investigation, or in any sense as an instrument of the military." *United States v. Payne*, 47 M.J. 37, 42 (C.A.A.F. 1997) (citation and internal quotation marks omitted). Whether military and civilian investigations merged into an indivisible entity is a question of fact. *Id.* (citations and internal quotation marks omitted). In determining whether a civilian investigator is acting as an instrument of the

military, a key factor is the degree of control exercised by the military authorities over the civilian investigator. *Id.* at 43 (citations and internal quotation marks omitted). More than a cooperative relationship between the civilian investigators and military authorities is required before Article 31 rights must be read. *See id.* (citations and internal quotation marks omitted); *United States v. Garcia*, 69 M.J. 658, 662 (C.G. Ct. Crim. App. 2010), *aff'd*, 70 M.J. 87 (C.A.A.F. 2011).

### 3. Analysis

The military judge found that the investigations of GFPD and AFOSI did not merge at the time of Appellant's interrogation. He also found that GFPD was not acting as an instrument of the military. We agree with the military judge on both points. We adopt his findings of fact in his written ruling as they are not clearly erroneous.

Appellant claims the GFPD's "sole involvement was to question Appellant at the request and direction of AFOSI SA JF." We find little support in the record of trial for this proposition. The military judge thoroughly addressed GFPD's investigative role in his written ruling. His findings show GFPD's involvement was extensive and was not directed by SA JF or AFOSI.

The military judge began his analysis of GPFD's involvement by noting the assault occurred off-base in the GFPD's area of primary jurisdiction. He found it was GFPD who requested Appellant and A1C CR be interviewed, not AFOSI. He noted the location of the interview was at the GFPD station, not at the AFOSI detachment. The first major investigative step occurred when GFPD interviewed A1C ME at the hospital and obtained evidence from her phone. GFPD also decided to retrieve A1C ME's sexual assault forensic examination from the hospital. We observe no AFOSI involvement in these investigative steps. The GFPD's investigation was well underway by the time AFOSI was asked to do anything.

The military judge characterized SA JF's initial role as "OSI did assist in retrieving the [Appellant] and [A1C CR]." We agree. It was GFPD who decided Appellant and A1C CR needed to be questioned. SA JF was a mere facilitator at that point. SA JF asked the First Sergeant to transport Appellant and A1C CR to the GPFD station. SA JF did not meet them until they were in the GFPD's station lobby. We note that Appellant and A1C CR were on-base when the First Sergeant located them. They were not taken to the AFOSI detachment but were instead taken off-base to the GFPD station. Additionally, we see no involvement by SA JF in A1C CR's interrogation which occurred before Appellant's interrogation.

Appellant next argues that SA JF was an "active participant" in his interrogation, that GFPD "frequently consulted with him," and that SA JF helped

expand the scope and depth of the incriminating statements. There is no doubt SA JF observed Appellant's interrogation. There is also no doubt that when Master Patrolman OD took breaks, he came into the observation room and talked to SA JF. The military judge found that this was largely a "professional courtesy" by GFPD towards SA JF and "to make use of [SA JF's] experience since he was present and available." We agree with the military judge. While this involvement was more substantial than facilitating Appellant's presence at the GFPD station, for the GFPD officers it was just a matter of convenience to consult with SA JF when they decided to take breaks. SA JF could not even recall exactly what he offered to GFPD but the essence of his "help" was the GFPD should get key details on what A1C ME actually said. We find this "help" did not merge the two investigations and did not make Master Patrolman OD act in furtherance of a military investigation as he was already seeking the same information. Receiving this limited help from SA JF did not transform the GFPD officers into instruments of the Air Force. We also note that one of the most important investigative developments in this case, asking Appellant to write an apology letter, originated with Master Patrolman OD and was executed without any assistance from SA JF.

Even after SA JF joined Appellant's interrogation, the investigations did not merge as the GFPD continued to act independently. After SA JF's questioning, GFPD collected Appellant's cell phone and placed it into evidence. GFPD obtained A1C CR's consent to photograph his vehicle and had A1C CR show them where his vehicle had been parked at the second bar. Appellant was arrested based on a probable cause determination by Master Patrolman OD and incarcerated for a violation of Montana state law in a county confinement facility. The state of Montana would not dismiss the criminal case against Appellant until ten days after his interrogation. We observe no AFOSI involvement in any of these investigative steps.

Additionally, AFOSI took several investigative steps separate and apart from the efforts of GFPD. AFOSI opened up their own investigation upon notification of the incident from Capt SA. AFOSI conducted background checks on Appellant and A1C ME prior to the Air Force obtaining jurisdiction. AFOSI interviewed one of HM's friends who saw Appellant and A1C ME outside the vehicle after the incident. This interview was prior to the Air Force obtaining jurisdiction.

The military judge found SA JF did not actively attend or participate in Appellant's interrogation until SA JF entered the room. At this point, SA JF provided an Article 31 rights advisement and Appellant promptly waived his Article 31 rights just as he had waived his *Miranda* rights. At trial, Appellant argued that SA JF needed to provide a cleansing statement to Appellant that nothing he told the GFPD could be used against him. We disagree that a

cleansing statement was required. As described above, the initial interrogation of Appellant by GFPD only required Appellant be read his *Miranda* rights, not his Article 31 rights.

On the whole, we observe two independent law enforcement entities engaged in limited cooperation. Master Patrolman OD denied the existence of a "joint investigation" and SA JF never used those words in his testimony. SA JF was not even the lead investigator for AFOSI. Further, we see no reference to a joint investigation in the excerpts of the AFOSI report of investigation attached as evidence for consideration during the motion to suppress hearing. Appellant's claims of a merged investigation are not supported by the evidence submitted during the motion to suppress.

The military judge also noted that the GFPD actually advised Appellant of the general nature of the offense, sexual assault, when Appellant asked why he and A1C CR got pulled into GFPD station. The military judge found this occurred 12 minutes into the interrogation and before GFPD obtained any information about what happened in the back seat with A1C ME. The military judge then concluded that even if the investigations were merged or the GFPD was acting as an instrument of the AFOSI, the combination of the *Miranda* warning and the notice of what Appellant was being investigated for were sufficient to meet Article 31 requirements. The military judge relied on *United States v. Redd*, 67 M.J. 581 (A. Ct. Crim. App. 2008) as authority for this conclusion. We considered whether to adopt the rationale of *Redd* to Appellant's case. We find it unnecessary as we concluded above that the GFPD only were required to provide *Miranda* warnings. As our sister court noted, their finding that *Miranda* warnings satisfied Article 31 was fact-specific. *Id.* at 589 n.9. There may be a future case for us to consider the applicability of *Redd* but it is unnecessary in Appellant's case. We find the military judge did not abuse his discretion and correctly ruled when he denied the motion to suppress.

**B. Limits on Cross-Examination of A1C ME**

**1. Additional Background**

To understand and analyze this assignment of error—that the military judge improperly limited cross-examination of A1C ME on a specific instance of untruthfulness and bias—we must first provide some context on the evidence the Defense actually introduced to attack A1C ME's credibility during trial.

A1C ME was a paralegal in the military justice section of the Malmstrom AFB legal office when she first arrived at Malmstrom AFB in October 2016. After just a few months, in early February 2017, the wing SJA, Lt Col AB, removed her from that position after A1C ME disclosed Privacy Act information from nonjudicial punishment actions to other Airmen. The SJA moved

A1C ME to the general law section of the legal office where she began working for Capt SA. On 10 February 2017, Lt Col AB gave A1C ME a letter of reprimand (LOR) for her misconduct. A1C ME responded to the LOR in writing and requested it be lowered to a letter of counseling. A1C ME wrote that she was trying to defend the Air Force's actions when she disclosed the information. Lt Col AB decided to maintain the LOR and place it in his desk drawer instead of forwarding it to A1C ME's commander and first sergeant for filing in a personnel information file.[12] The day on which A1C ME was notified of the SJA's final decision on the LOR was 17 February 2017, the same day that she went to Appellant's house for the "pre-game."

Given the timing of A1C ME's removal from military justice and the close-out of her LOR, trial defense counsel attempted to show A1C ME had motive to misrepresent her accusations against Appellant. In trial defense counsel's view, A1C ME was dissatisfied with her current situation in the Malmstrom AFB legal office and needed an expedited transfer to get a fresh start and the way to do that was to accuse Appellant of sexual assault. Several members of the legal office testified that they heard A1C ME say once, in the months before her accusations against Appellant, that a group of female Airmen who lived in the dormitories at Malmstrom AFB knew what they needed to say and to do to get an expedited transfer. One of those witnesses explicitly stated that what needed to be done was "you have to have an unrestricted sexual assault report and see the [Sexual Assault Response Coordinator]." This witness opined that this was "not very" hard. Members of the legal office believed there was an increase in outgoing expedited transfers from Malmstrom AFB during the winter of 2016–2017.

To counter the notion that A1C ME wanted to leave Malmstrom AFB, trial counsel presented evidence that A1C ME did not want an expedited transfer after she first reported the sexual assault. Capt SA testified about her conversation with A1C ME on this subject, which occurred the same day A1C ME reported the sexual assault but after she had been released from the hospital and slept. Capt SA testified:

> So, in the legal office, we have a unique perspective on when sex assaults occur in the military. And the general rumor is that you get—you'll accuse someone of sexual assault to get an expedited transfer out of Malmstrom [AFB]. [A1C ME] did not want to do

---

[12] Air Force Instruction 36-2907, *Unfavorable Information File (UIF) Program*, ¶ 4.5.2 (26 Nov. 2014), reads "[t]he person who initiates a … LOR may send it to the member's commander or superiors for information, action, or for their approval for file in the UIF or PIF." For officers, LORs must be filed in a UIF. *Id.*

that, but I insisted . . . [she not] foreclose that opportunity because you don't know how you're going to feel later and being close to family can be very beneficial towards your healing process.

A1C ME told Capt SA that she "didn't want to be considered one of those victims." However, a few days later, A1C ME changed her mind when stories of Appellant's arrest by GFPD were posted on Facebook. A1C ME testified "[a]fter the articles were released, everybody kept asking—people would screenshot the article and send it to me asking if it was me. I couldn't roll through the gate without somebody asking me if I was the person."

Trial counsel also attempted to show the LOR that A1C ME received from Lt Col AB was only going to have a minimal impact on A1C ME's paralegal career. To this end, A1C ME testified "it was going to be a desk drawer LOR" and "it would disappear in six months." In later testimony, the Malmstrom AFB law office superintendent, MSgt DH, confirmed the LOR was going to be filed in the SJA's desk drawer but contradicted A1C ME stating the SJA said nothing about the LOR disappearing in six months. On cross-examination, MSgt DH also opined that A1C ME's character for embellishment was "she tends to embellish and exaggerate a little bit."

With that background, we turn to the facts of the actual assignment of error. Appellant argues the military judge should have also allowed cross-examination of A1C ME regarding a specific instance of conduct where A1C ME allegedly lied to the civilian court reporter, Mr. JF, about receiving a commander's coin. During cross-examination A1C ME remembered having a brief conversation with Mr. JF after she was removed from military justice. Trial defense counsel then asked whether A1C ME recalled telling Mr. JF that if she was such a bad Airman, then why did she get coined by a commander. A1C ME did not recall this portion of the conversation. Trial defense counsel next asked A1C ME whether she had actually been coined by a commander. Trial counsel objected to relevance and that "it's a specific instance of conduct." Trial defense counsel responded "I'm going into specific instances of dishonesty and untruthfulness." The military judge sustained the objection and told trial defense counsel to "move on." Rather than moving on, trial defense counsel asked A1C ME "you lied to Mr. [JF] about getting coined by a commander, correct?" Trial counsel objected again and the military judge sustained the objection a second time. The military judge did not elaborate on why he sustained the objections.

Mr. JF was a retired Master Sergeant paralegal and former Law Office Superintendent at the wing level for the last four years of his 24-year career. When Mr. JF later testified for the Defense, he remembered A1C ME asking him to review her LOR response as Mr. JF had also been a defense paralegal for two years. He was not asked about the alleged lie by A1C ME about the

commander's coin as this would be prohibited under Mil. R. Evid. 608(b), but Mr. JF described A1C ME as "not truthful" and that she exaggerated "quite often."

**2. Law**

We review a military judge's evidentiary rulings for an abuse of discretion. *United States v. Owens*, 51 M.J. 204, 209 (C.A.A.F. 1999). The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000). The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous. *Id.* (citations and internal quotation marks omitted).

The Sixth Amendment[13] protects an accused's right to confrontation and cross-examination. *Id.* at 129. (citations omitted). A defendant's Sixth Amendment right to confront the witnesses against him is violated where it is found that a trial judge has limited cross-examination in a manner that precludes an entire line of relevant inquiry. *United States v. Bess*, 75 M.J. 70, 75 (C.A.A.F. 2016) (citation omitted). "[T]he right to present relevant testimony is not without limitation. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011) (alteration in original).

"For constitutional errors, the Government must persuade us that the error was harmless beyond a reasonable doubt." *Bess*, 75 M.J. at 75 (citations omitted). A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Mitchell v. Esparza*, 540 U.S. 12, 17–18 (2003) (citations omitted). "An error has not contributed to the verdict when it was unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *United States v. Collier*, 67 M.J. 347, 356 (C.A.A.F. 2009) (citation and internal quotation marks omitted). If the excluded evidence may have "tipped the credibility balance" in Appellant's favor, the error would not be harmless beyond a reasonable doubt. *United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006).

"Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the [witness'] credibility." Mil. R. Evid. 611(b). "Trial judges have broad discretion to impose reasonable limitation on cross-examination, 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

---

[13] U.S. CONST. amend. VI.

repetitive or only marginally relevant.'" *McElhaney*, 54 M.J. at 129 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

In assessing whether an error is harmless beyond a reasonable doubt we look to "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *United States v. Williams*, 40 M.J. 216, 218–19 (C.M.A. 1994) (quoting *Van Arsdall*, 475 U.S. at 684). Mil. R. Evid. 608(b) reads:

> *Specific Instances of Conduct.* Except for a criminal conviction under Mil. R. Evid. 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. The military judge may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness . . . .

"Relevant evidence is admissible." Mil. R. Evid. 402. "Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Mil. R. Evid. 401. "The military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: . . . confusion of the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." Mil. R. Evid. 403. Where a military judge conducts a proper balancing test under Mil. R. Evid. 403, an appellate court will not overturn the ruling absent a clear abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010) (quoting *United States v. Ruppel*, 49 M.J. 247, 251 (C.A.A.F. 1998)). However, we "give[ ] military judges less deference if they fail to articulate their balancing analysis on the record, and no deference if they fail to conduct the Rule 403 balancing." *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citation omitted).

**3. Analysis**

In his assignment of error, Appellant lists bias as a reason for permitting the cross-examination of A1C ME. We disagree. At trial Appellant never mentioned bias as a theory for admissibility so the military judge made no ruling under Mil. R. Evid. 608(c). Instead, trial defense counsel only used the words "dishonesty" and "untruthfulness" which would not orient the military judge to Mil. R. Evid. 608(c) but towards Mil. R. Evid. 608(b). We see no connection

between any bias A1C ME may have towards Appellant and any statement she made to Mr. JF about a commander's coin.

Appellant's primary argument is the military judge's ruling was contrary to the plain text of Mil. R. Evid. 608(b). Appellant also attempts to connect later rulings the military judge made under Mil. R. Evid. 608(b) regarding testimony of other witnesses to his ruling disallowing cross-examination of A1C ME about the commander's coin. First, we disagree that the military judge's ruling was contrary to the plain language of Mil. R. Evid. 608(b). Second, we conclude his later rulings on Mil. R. Evid. 608(b), on different witnesses, provide no insight into why he did not allow the cross-examination of A1C ME about the commander's coin. Military judges are presumed to know the law and to follow it absent clear evidence to the contrary. *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citation omitted). The military judge gave no explanation for sustaining the objection at the time, but this does not mean he misapplied Mil R. Evid. 608(b) when he ruled. Instead, as we have no clear evidence to the contrary, we conclude the military judge determined the specific instance of whether A1C ME lied to Mr. JF about a commander's coin was not probative of A1C ME's character for untruthfulness. We review this ruling for an abuse of discretion.

The United States Court of Military Appeals stated "cross-examination regarding specific instances of misconduct is at the discretion of the military judge." *United States v. Stavely*, 33 M.J. 92, 94 (C.M.A. 1991) (interpreting a prior version of Mil. R. Evid. 608(b)). In *Stavely*, the court found prejudicial error when defense counsel was not permitted to question a crucial government witness about lying at an administrative board hearing. *Id.* "When such a specific act of misconduct is, in and of itself, directly probative of the witness' truthfulness, a military judge must allow it because, by definition, it is always relevant to the issue of that witness' credibility." *Id.* (quoting *United States v. Boone*, 17 M.J. 567, 569 (A.F.C.M.R. 1983)). In another case, the United States Army Court of Criminal Appeals found error when the military judge refused to permit cross-examination about the witness' false statement about her identity, determining "whether or not an individual lies to a police officer is highly probative of that individual's veracity." *United States v. Montgomery*, 56 M.J. 660, 667 (A. Ct. Crim. App. 2001) (citations omitted).

In response to Appellant's assertion, the Government's answer argues that Mil. R. Evid. 608(b) does not permit a "barrage of questioning related to every lie told in a [witness'] life, no matter how small or insignificant. . . ." We agree with the Government that military judges retain discretion under Mil. R. Evid. 608(b) to determine whether any particular cross-examination about a prior lie is probative of character for untruthfulness. The rule uses the words "may" and "allow" which indicate the military judge's discretion. In this case, the trial

defense counsel did not request to be heard further about why the lie about the commander's coin was relevant and probative of A1C ME's character of truthfulness.

Turning to the case law cited above, on the one hand, we can easily see the alleged lie was not during an administrative board hearing like in *Stavely* and was not made to police like in *Montgomery*. On the other hand, the alleged lie appears to be told in the workplace and may have had some connection to A1C ME's LOR response. It was told to a civilian court reporter assigned to A1C ME's office who was a retired Air Force senior noncommissioned officer and paralegal. From what is contained in the record of trial, the cross-examination was not wholly devoid of probative value on A1C ME's character for untruthfulness. As the probative value on character for untruthfulness is open to reasonable debate, we will assume *arguendo* that the cross-examination had probative value on character for untruthfulness under Mil. R. Evid. 608(b) and that its probative value would not be substantially outweighed by confusion of the issues or a waste of time under Mil. R. Evid. 403, and that in ruling to the contrary the military judge abused his discretion by sustaining the objections.

Appellant claims the military judge's ruling deprived him of his Sixth Amendment right to confrontation of A1C ME. Even if we assume *arguendo* that the assumed error was of a constitutional magnitude, we find the exclusion was harmless beyond a reasonable doubt. The military judge did not preclude an entire line of inquiry during cross-examination. Far from it, the military judge permitted other cross-examination of A1C ME on her untruthfulness. For example, trial defense counsel questioned A1C ME regarding whether she rubbed Appellant's penis while at his house. At first, A1C ME testified she did not recall this. Upon further questioning, A1C ME stated it never happened. Two witnesses testified for the Defense that they saw A1C ME touch Appellant's penis, effectively impeaching her by contradiction. One of these witnesses also testified that "I don't think [A1C ME] is a very honest human being."

Cross-examination explored the full range of A1C ME's credibility, recall and memory, believability, and prior inconsistent statements. Limiting cross-examination on the commander's coin did not deprive Appellant of an effective cross-examination of A1C ME. *See Bess*, 75 M.J. at 75. The excluded evidence would not have "tipped the credibility balance" in Appellant's favor. *See Moss*, 63 M.J. at 239. It was wholly unimportant in relation to everything else the members considered on A1C ME's believability and ability to accurately recall the events in question. During the defense case, Mr. JF opined that A1C ME was "not truthful" and that she exaggerated "quite often." Adding at least some

of the basis for this opinion, through cross-examining A1C ME about the alleged commander's coin lie, when she did not even recall that portion of her conversation with Mr. JF, would have contributed nothing of value.

Considering the factors cited in *Williams*, 40 M.J. at 218–19, A1C ME was the key prosecution witness as the named victim on the charge sheet. The testimony about the commander's coin was not cumulative with other evidence presented. But there was ample evidence presented on A1C ME's character for truthfulness as several military members, both officer and enlisted, as well as civilian employees testified that A1C ME had an untruthful character. On the material points of A1C ME's testimony—specifically what happened during the penetration of her vulva by Appellant's finger—we find A1C ME was corroborated by HM's testimony. Additionally, we find Appellant's statements to GFPD and his written apology to A1C ME corroborated some portions of A1C ME's testimony. The cross-examination permitted was extensive and effective covering in excess of 60 pages in the transcript. The line of inquiry prohibited amounted to one question and answer. While the Defense ably challenged the Prosecution's evidence at every turn, we conclude on the whole the Prosecution's case was solid. It hinged not just on A1C ME's testimony, but on the statements Appellant made to GFPD, and the testimony of HM who heard A1C ME say "stop" multiple times in a serious tone of voice. We are convinced beyond a reasonable doubt that the exclusion of the lie about the commander's coin did not contribute to the verdict obtained. *See Esparza*, 540 U.S. at 17–18 (citations omitted).

**C. Legal and Factual Sufficiency**

**1. Additional Background**

Appellant raises a multitude of concerns about the legal and factual sufficiency of his conviction, *inter alia*: (1) A1C ME was the only eyewitness; (2) the Prosecution did not present the results of the sexual assault forensic examination; (3) Appellant reasonably believed the sexual encounter with A1C ME was consensual; (4) A1C ME's lack of credibility and motive for bias were of utmost importance; (5) at least five witnesses testified that A1C ME was an untruthful person; (6) three additional witnesses testified A1C ME exaggerated things she said; (7) A1C ME's testimony was riddled with inconsistencies and falsehoods that were contradicted by her own friends and co-workers; (8) A1C ME lied to her friends when she told them she avoided Appellant after she knew he was married; (9) A1C ME provided inconsistent reasons to various people for staying in the car with Appellant; (10) A1C ME's career was in serious jeopardy; (11) A1C ME lied when she said her LOR would disappear in six months; and (12) A1C ME lied about knowing exactly what to say to get an expedited transfer.

The Government responds by arguing the only element in dispute is whether A1C ME consented to Appellant placing his finger in her vagina. The Government argues that A1C ME's testimony was corroborated on many points based on the testimony of other witnesses and other evidence in the case. Particularly, the Government points to statements Appellant made to GFPD and in his apology letter. The Government asserts the conviction is legally and factually sufficient. We agree.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In Appellant's case, based on the charge sheet, the elements of sexual assault in violation of Article 120, UCMJ, included the following: (1) that at the time and place alleged, Appellant committed a sexual act upon A1C ME, to wit: penetrating her vulva with his finger; (2) that Appellant did so by causing bodily harm to A1C ME, to wit: penetrating her vulva with his finger; (3) that Appellant did so without the consent of A1C ME; and (4) that Appellant did so with an intent to gratify his sexual desire. *See Manual for Courts-Martial,*

*United States* (2016 ed.), pt. IV, ¶ 45.b.(4)(b). In this case, "sexual act" means the penetration, however slight, of the vulva of another by any part of the body with an intent to gratify the sexual desire of any person. 10 U.S.C. § 920(g)(1)(B). "Bodily harm" means any offensive touching of another, however slight, including any nonconsensual sexual act. 10 U.S.C. § 920(g)(3). "Consent" means a freely given agreement to the conduct at issue by a competent person. 10 U.S.C. § 920(g)(8)(A). An expression of lack of consent through words or conduct means there is no consent. *Id.*

### 3. Analysis

We begin with Appellant's assertion that A1C ME was the only eyewitness. In one sense, this is true as she was the only person other than Appellant present during the digital penetration of her vulva. In another sense, this is an oversimplification of the evidence available to the factfinder. During the assault, A1C ME was texting and talking on the phone with HM, who overheard the assault. A1C DW came out to the vehicle and locked and unlocked the vehicle multiple times giving Appellant time to move away from A1C ME. Finally, HM and two of her friends arrived shortly after the assault and observed the demeanor of A1C ME and Appellant. We considered all of this evidence, as well as the admissions of Appellant and his written apology letter, as all of it was presented to the factfinder. We conclude that A1C ME's testimony did not stand alone.

Second, Appellant believes we should look at the Prosecution's decision to not offer the results of the sexual assault forensic examination into evidence. We decline to do so as we limit our review on legal and factual sufficiency to the evidence produced at trial.

Appellant's third challenge is that he reasonably believed the sexual encounter with A1C ME was consensual. The military judge properly instructed the members on mistake of fact as to consent and its two components: that the mistake must have existed in Appellant's mind and must have been reasonable under all the circumstances. A reasonable factfinder could have determined that even if Appellant actually believed A1C ME was consenting that his belief was unreasonable under the circumstances. The court members could have concluded that when A1C ME told Appellant "no," "stop," or "hold on" multiple times that Appellant did not listen or comply and chose to digitally penetrate A1C ME when a reasonable person would not think she was consenting.

We consolidate the remaining nine concerns that Appellant raises. Each of them focuses on various aspects of A1C ME's believability. The evidence regarding A1C ME's credibility, her prior inconsistent statements, her inability to recall, and alleged lies were on full display during the trial. We need not recount them again. Considering this evidence together, there is no question

that trial defense counsel mounted extensive challenges to A1C ME's believability as a witness. However, we do not consider this evidence, while robust, in isolation from the rest of the evidence presented to the members.

A rational factfinder could have weighed all of this evidence on A1C ME's believability and still concluded beyond a reasonable doubt that Appellant penetrated A1C ME with his finger without her consent. For example, a rational factfinder could have relied on the text messages, the phone calls, the statements that Appellant made to GFPD, the apology Appellant wrote to A1C ME, and used it in conjunction with A1C ME's testimony to determine Appellant's guilt beyond a reasonable doubt.

Particularly, the testimony of HM about her phone call to A1C ME went largely unchallenged during the trial. To be clear, it helped the Defense to the extent HM heard A1C ME making "moaning or sexual noises," but the presence of this fact that was helpful to the Defense also made it difficult for the Defense to show HM was biased towards her best friend, A1C ME. Most importantly, HM heard A1C ME say "stop" three or four times in a serious tone of voice. This corresponded to the timeline where Appellant and A1C ME both agreed digital penetration was occurring. HM also heard A1C ME use Appellant's name. Appellant admitted to GFPD that he told A1C ME "if you want me to stop, say my name."

After hearing the encounter over the phone, HM was scared and upset. When she arrived on scene, HM approached Appellant at a fast pace and yelled at him that they needed to talk about what happened. Later, HM would demand A1C ME report the incident or she was going to Appellant's house to "beat the s\*\*t out of him." While not conclusive that a sexual assault occurred, there was no challenge to how seriously HM took the situation. A reasonable factfinder could have concluded that HM reacted so strongly because she overheard Appellant sexually assaulting her best friend in real time.

The physical reactions of A1C ME that HM and others observed—which included crying and vomiting—also went largely unchallenged. A1C ME drank alcohol that night but the Defense did not try to connect her alcohol intake to her vomiting. A rational factfinder could determine that A1C ME broke down and cried hysterically until the point of vomiting because she had just been sexually assaulted.

Another example of post-assault behavior—the weird arm hug observed by HM immediately after A1C ME exited the vehicle—could be interpreted two ways. In Appellant's view, it would show nothing criminal occurred in the back seat. Alternatively, a rational factfinder could have concluded that A1C ME was trying to escape the situation uneventfully and then wanted to prevent HM from physically assaulting Appellant. In conducting a legal and factual

sufficiency review, the law does not require the evidence be free from conflict. *See Wheeler*, 76 M.J. at 568.

Turning to Appellant's apology letter to A1C ME, a reasonable factfinder could have found multiple admissions of guilt in it. When Appellant wrote he did not take "what [A1C ME] said seriously," the court members could have decided Appellant was referencing A1C ME saying at various times "no," "stop," or "hold on." When Appellant wrote "I should have let you go when you were ready to leave," the court members could have determined that Appellant knew A1C ME wanted him to stop but that he would not let her go and instead kept penetrating her vagina with his finger.

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence was legally sufficient to support Appellant's conviction of sexual assault of A1C ME beyond a reasonable doubt. *Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the military judge did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for sexual assault is both legally and factually sufficient.

## D. Rebuttal Sentencing Evidence

### 1. Additional Background

During sentencing, A1C ME delivered an R.C.M. 1001A oral unsworn statement to the court members. The military judge admitted a nearly identical written version of the unsworn statement as a court exhibit. In the oral unsworn statement, A1C ME stated *inter alia*:

> I am constantly worried. I worry about other people's intentions with me at any time and any place. Are they going to hurt me? Where can I escape to? And where is my nearest friend? How am I going to get home? These are the questions that come into my mind during any kind of group interactions. This is especially real when any males enter the group. I avoid one-on-one interactions with males.

At a session without the court members, trial defense counsel indicated he had some exhibits he wanted to "pass around the courtroom." Trial counsel requested a closed session as the exhibits potentially involved Mil. R. Evid. 412 matters. The military judge agreed and conducted a closed session.

In that closed session, trial defense counsel offered screenshots of pictures from A1C ME's Instagram account purportedly posted some months after the assault. Trial defense counsel argued the screenshots were of A1C ME, were

admissible to explain, repel, counteract, or disprove A1C ME's unsworn statement, and were not covered by Mil. R. Evid. 412. Trial defense counsel claimed failure to admit the screenshots would leave the members with the erroneous impression that A1C ME has been rendered a hermit by this traumatic event. Trial counsel argued the screenshots were not proper rebuttal and were covered under Mil. R. Evid. 412.

The military judge did not admit any of the screenshots. He found the unsworn statement of A1C ME generally contained just her opinions and the only statement of fact she made was "I avoid one-on-one interactions with males." The military judge determined the screenshots did not rebut this fact. Turning to Mil. R. Evid. 412, the military judge found the screenshots depicted sexual behavior or sexual predisposition based on the manner of dress shown and that no exception applied.

Appellant claims the military judge abused his discretion as A1C ME opened the door to the screenshots by making the statements she did in her unsworn statement. In Appellant's view, the military judge allowed the court members to be completely misled. In response, the Government argues the military judge correctly determined there was only one statement of fact subject to rebuttal and that "Appellant does not claim any of the pictures he attempted to introduce show A1C ME in one-on-one interactions with males." We find the military judge committed no error when he did not admit the screenshots the Defense offered as rebuttal evidence.

**2. Law**

"Interpreting R.C.M. 1001A is a question of law, which we review de novo." *Barker*, 77 M.J. at 382 (citation omitted). R.C.M. 1001A(e) provides in pertinent part that during presentencing proceedings, the victim of an offense of which the accused has been found guilty

> may make an unsworn statement and may not be cross-examined by the trial counsel or defense counsel upon it or examined upon it by the court-martial. The prosecution or defense may, however, rebut any statements of facts therein. The unsworn statement may be oral, written, or both.

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which [s]he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). The application of Mil. R. Evid. 412

to proffered evidence is a legal issue that appellate courts review de novo. *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010) (citation omitted).

Mil. R. Evid. 412 provides that in any proceeding involving an alleged sexual offense, evidence offered to prove the alleged victim engaged in other sexual behavior or has a sexual predisposition is generally inadmissible, with three limited exceptions. The burden is on the defense to overcome the general rule of exclusion by demonstrating an exception applies. *United States v. Carter*, 47 M.J. 395, 396 (C.A.A.F. 1998) (citation omitted). Mil. R. Evid. 412(b) contains three exceptions: (1) evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury, or other physical evidence; (2) evidence of specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent or by the prosecution; and (3) evidence the exclusion of which would violate the constitutional rights of the accused.

### 3. Analysis

#### a. Rebuttal

We agree with the military judge that the screenshots offered by the Defense did not rebut any statement of fact in A1C ME's oral or written unsworn statement. No males are shown in any of the screenshots. Therefore, the screenshots do not rebut A1C ME's assertion that she avoids one-on-one interactions with males. Appellant claims the public settings in some of the screenshots warrants a different result. We disagree. As A1C ME never stated that she refused to go out in public, we see little connection between the location of some of the screenshots and her statement about avoiding one-on-one interactions with males.

#### b. Mil R. Evid. 412

"Sexual behavior" under Mil. R. Evid. 412 includes any sexual behavior not encompassed by the alleged offense. Arguably, when A1C ME posted the photos on Instagram her conduct met the definition of sexual behavior. "Sexual predisposition" under Mil. R. Evid. 412 refers to an alleged victim's mode of dress, speech, or lifestyle that does not directly refer to sexual activities or thoughts but that may have a sexual connotation for the factfinder. We have no doubt that some of the depictions in the screenshots meet this definition based on the revealing mode of dress and camera angle. *See* Mil. R. Evid. 412(d). We find no abuse of discretion by the military judge in determining the screenshots were evidence covered by Mil. R. Evid. 412.

During sentencing, trial defense counsel argued they were not "offering [them] to prove" A1C ME's sexual behavior or A1C ME's sexual disposition but were merely offering the evidence to rebut her unsworn statement. We are not

persuaded. The screenshots chosen by the Defense did not actually rebut any statement of fact made by A1C ME. We find the screenshots are covered by Mil. R. Evid. 412's general rule on inadmissibility and were offered to prove at a minimum her sexual predisposition post-assault.

We need not address the three exceptions in Mil. R. Evid. 412(b). At trial and on appeal, Appellant never attempted to argue that any of them applied to his sentencing proceeding. We acknowledge the military judge addressed the relevance, materiality, and unfair prejudice of the screenshots when he ruled on the admissibility of the screenshots. We decline to review that analysis further as the Defense has not attempted to meet their burden to show an exception exists. *See Carter*, 47 M.J. at 396.

We conclude the military judge did not abuse his discretion when he relied on Mil. R. Evid. 412 as part of the basis for excluding the screenshots from A1C ME's Instagram account.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court